Josephine Knudsen, appellee, v. Phillip H. McNeely,
appellant.

66 N. W. 2d 412

Filed October 22, 1954.  No. 33600.

*J. J. Maher* and *Brogan & Brogan,* for appellant.

*Bernard Ptak,* for appellee.

Heard before Simmons, C. J., Carter, Messmore,
Yeager, Chappell, Wenke, and Boslaugh, JJ.

Boslaugh, J.

This proceeding is prosecuted by appellee for recovery from appellant of disability benefits provided in the

Nebraska Workmen's Compensation Act. The basis for it is that appellee says she was employed by appellant to perform labor in the cafe operated by him in the city of Norfolk for a weekly wage of $18 and two meals each day; that appellee was the victim of an accident that arose out of and in the course of her employment; and that as a result thereof she sustained an injury to her right arm that caused her temporary total disability. Appellant denied her claim. The compensation court on rehearing therein disallowed and dismissed the claim and appellee appealed to the district court. A hearing therein resulted in findings and judgment for her. This appeal is from that judgment.

Appellee suffered a fracture of the radius of her right arm at about the lower third thereof or about 4 inches above the lower end of the bone January 1, 1940. The fracture was slightly comminuted and there was displacement and overriding of the fragments of the bone. She was treated for the fracture at the Rosebud Indian Hospital at Rosebud, South Dakota. An attempt to reduce the fracture was made when she entered the hospital on the date of the accident, but it was not satisfactory or successful. A doctor described as "head doctor" was away when she entered the hospital. He returned about a month thereafter and performed an operation on her arm. The fracture of the radial shaft was immobilized by a three-hole metal bone plate and several loops of wire which encircled the plate and the shaft of the bone on either side of the fracture. An X-ray of March 2, 1940, shows that the bone was in satisfactory position. Appellee entered the hospital January 1, 1940, and was released in March 1940. Her arm was in a cast until May 19, 1940. It is shown by an X-ray of April 8, 1940, that the bone plate was in proper position, bound to the bone by screws and wire, and that the radial fragments were in practically perfect apposition. An orthopedic surgeon testified from an examination of the X-ray last referred to above that the bone was

straight; that there was no absorption or penciling down of the bone; that the radius was apparently the same length as the ulna; and that union of the bone was taking place at the date of the X-ray April 8, 1940. The situation exhibited was so satisfactory that the witness by examining the X-ray said he could "just barely see where it (the bone) is broken * * *."

Appellee was employed by appellant to work in the kitchen of his cafe in October 1944, and she worked there for him until the time she says she was injured on the morning of August 30, 1951. Her hours were from 9 in the evening to 6 in the morning each day of the week. Her compensation was $18 a week and two meals each day. Her duties were confined to the kitchen of the cafe. They consisted of preparing used and soiled dishes for the dishwashing machine, placing them in trays, moving the trays into the dishwashing machine, taking them from the machine, drying and stacking the dishes, and returning the trays to the table where the dishes were deposited as they were brought in from the serving portion of the cafe. She carried the utensils and containers such as big heavy soup pots and roasters that were too large to be put in the machine to and from the sink and washed them at the sink. She had to clean and scrub the steam table. It had six inserts which were required to be taken out and cleaned. She was required to clean and scrub the whole kitchen each night and to do any similar work in the kitchen which she was asked to do. She had no difficulty performing her duties. She made no complaints about her right arm or her ability to do the work during the long period she was employed by appellant, except in damp weather she would sometimes say her arm ached. There is no proof that she did not carry on satisfactorily or that her employer complained of the manner of her services.

The kitchen was north of the room in which patrons of the cafe were served. It was of considerable size, about 22 feet wide. The exact length of it is not shown.

The dishwashing machine was adjacent to the west wall of the kitchen. There were two metal tables, one to the south and one to the north of the dishwasher. They were about 3 feet high and each had a metal rim or edge about ¾ of an inch thick that extended about 2 inches above the floor of the table to prevent fluids or other materials from falling from them to the floor. The north end of the south table and the south end of the north table were against the dishwasher so that a tray containing dishes to be washed could be slid on the floor of the south table through a door into the machine and from it onto the floor of the north table. The soiled or used dishes were brought from the dining room and deposited on the south table. Appellee removed any materials on them and placed them in a tray in proper position to be washed. When the tray was filled she slid it into the machine and while these were washing appellee would carry a tray from the north table to the south one and stack dishes in it. She would remove the first one from the machine to the table to the north and move the second one into the machine. The dishes in the first tray were dried by appellee and stacked on a long table, the west part of which was about 2 feet east of the dishwashing machine and the two metal tables above described. She would repeat this operation until all the dishes were washed. The limited space between the tables formed an aisle in which appellee worked while moving the trays, and washing, drying, and stacking the dishes. The trays furnished to and used by appellee in these operations were about 2 feet square, and equipped with racks or dividers to support and hold the dishes in proper position for washing in the machine. Two of them were made of wood and one was metal that weighed about 10 pounds. There was an opening near the top and at the center of two sides of the trays in which the hands of the operator could be inserted when moving or lifting the trays. When transporting a tray from the north to the south table appellee lifted,

held, and carried it up to and against her chest because of the limited space in the aisle mentioned above and the size of the machine.

Appellee reported for duty at the cafe at 9 p. m., August 29, 1951. She engaged in the performance of the duties of her employment at the place of business of her employer from then until about 2 a. m., August 30, 1951, when the happening took place which is the basis of the claim of appellee. She finished drying dishes that were in the metal tray and had just been washed. The tray was wet and slippery because it had recently been in the dishwasher. It was difficult to handle. When she was in the act of picking up the tray to take it from the north to the south table she did not have hold of the handles of it but put her hands under it to bring it up to and against her chest. She rested it on its side on the ledge or edge of the table to get a firmer grip on it. The tray slipped and in attempting to control it appellee was caused to be off balance and her whole body went forward and downward. The tray went off and downward over the ledge of the table. She struck the outward part of her right arm about the place of the former fracture of the radius of her arm on the ledge of the table and her arm was injured. She immediately had a terrific pain in her arm, looked at it, and saw it was red where it had struck the table. She wrapped it in a dish towel, went to the dining room, and told a waitress who had been an employee in the cafe as long as appellee had been that she had an accident and had hurt her arm. Another waitress came and looked at the arm, applied gauze, and rebandaged it. Appellee could not do any work but she stayed until appellant came and she told him what had happened. He instructed her to consult and get the services of a doctor. The first waitress referred to above testified that appellee worked in the kitchen of the cafe the night her arm was injured doing her usual duties until the accident; that she could

not do anything after that; and the waitress and her husband finished the things, including the scrubbing of the kitchen, that appellee was supposed to do. The waitress said that appellee was in great pain and had tears in her eyes. The witness saw the arm and she said that it had an area that was red where appellee said she struck it.

The doctor she consulted at Norfolk examined her arm, found "she had movement over this area which she stated she had injured," and he suggested it might be a fracture through this site of the arm. He applied a splint and advised follow-up care for the first week or two. This was done and he eventually referred her to an orthopedic surgeon. Dr. Herman F. Johnson of Omaha examined her October 22, 1951. He operated her arm the next day. He examined the X-rays made at Rosebud, South Dakota, after the fracture of her arm January 1, 1940, the X-ray taken in Norfolk August 31, 1951, and the one taken October 22, 1951. He testified that the X-ray of April 8, 1940, showed that the radius was straight; that there was no absorption of the bone; that the radius was apparently the same length as the ulna; and that union of the bone was taking place on that date. The situation exhibited then was so satisfactory that the witness, by examining the X-ray, said he could "just barely see where it (the bone) is broken * * *." He said the X-ray of October 22, 1951, showed new bone at the place of the fracture of January 1, 1940, that was attempting to bridge the fragments of the radius and that this was confirmed by the operation of October 23, 1951. The opinion expressed by him was that appellee developed a weak union in 1940 but strong enough so that she could use her arm from the time the cast was removed May 19, 1940, until August 30, 1951. When he examined the arm in October 1951, the plate was broken and the radius completely divided. He concluded that there was a re-injury or fracture through a partially reunited old frac-

ture of the shaft of the radius of appellee.

The opinion and conclusion of Dr. Johnson were disputed by the testimony of an orthopedic surgeon examined by appellant who based his opinion entirely upon his examination and study of the X-rays in evidence in this case. He said that in his opinion there had not been any healing or union of the fracture of the radius of appellee after January 1, 1940.

Appellee has not been able to use her right arm for any useful purpose since it was injured August 30, 1951.

The issue in this case, as it is presented in this court, is whether or not there was an accident August 30, 1951, that caused appellee injury within the provisions of the Workmen's Compensation Act. A compensable injury within the provisions of the act is one caused by an accident arising out of and in the course of the employment. Seger v. Keating Implement Co., 157 Neb. 560, 60 N. W. 2d 598. An accident within the act is an unexpected or unforeseen event happening suddenly and violently and producing at the time objective symptoms of injury. § 48-151, R. R. S. 1943; Ruderman v. Forman Bros., 157 Neb. 605, 60 N. W. 2d 658. An employee claiming the benefit of the act must, to succeed, show by the greater weight of the evidence that an accident occurred. Ruderman v. Forman Bros., *supra.* An appeal to this court in a workmen's compensation case is considered and determined de novo upon the record. Myszkowski v. Wilson & Co., Inc., 155 Neb. 714, 53 N. W. 2d 203.

Appellant insists that the proof fails to show an accident within the meaning of the Workmen's Compensation Act. That there was an unexpected or unforeseen event happening suddenly and violently may not be successfully challenged. The evidence that there was is substantial and it is not disputed. There is convincing proof of objective symptoms of injury. Symptoms of pain and anguish such as weakness or expressions of pain clearly involuntary or any other symptoms in-

dicating a deleterious change in the bodily condition may constitute objective symptoms within the requirements of the statute. Manning v. Pomerene, 101 Neb. 127, 162 N. W. 492; Van Vleet v. Public Service Co., 111 Neb. 51, 195 N. W. 467; Bekelski v. Neal Co., 141 Neb. 657, 4 N. W. 2d 741; Beam v. Goodyear Tire & Rubber Co., 152 Neb. 663, 42 N. W. 2d 293.

It is certain from the proof that appellee had an imperfect and deformed right arm resulting from the accident and injury she suffered January 1, 1940, and that it was probably more susceptible to injury than a normal arm would have been, but this does not constitute a bar to her right of recovery for an accidental injury as provided in the Workmen's Compensation Act. Appellee is entitled to the recovery granted her because of the proof that she sustained an injury by an accident arising out of and in the course of her employment, notwithstanding a preexisting physical condition may have contributed to cause her disability. Tucker v. Paxton & Gallagher Co., 153 Neb. 1, 43 N. W. 2d 522.

Any injury suffered by appellee August 30, 1951, arose out of and in the course of her employment. The evidence that it did is abundant. Appellant makes no objection to the computation of benefits awarded appellee by the district court or to the amount of the judgment rendered for her.

The judgment of the district court should be and it is affirmed. Appellee should be and is allowed for her counsel for services in this court $250 to be taxed as costs in this court against appellant.

AFFIRMED.