LOYD S. TILGHMAN, APPELLANT, V. R. D. MILLS, FIRST AND REAL NAME UNKNOWN, DOING BUSINESS AS R. D. MILLS CONSTRUCTION CONTRACTOR, APPELLEE.

100 N. W. 2d 739

Filed January 22, 1960. No. 34712.

*Heaton & Heaton,* for appellant.

*Clinton & McNish,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

. MESSMORE, J.

This is an action arising under the provisions of the Nebraska Workmen's Compensation Act. The case was tried before one of the judges of the workmen's compensation court who entered an order of dismissal of the plaintiff's case. The plaintiff waived rehearing before

the entire compensation court and appealed directly to the district court for Cheyenne County. Although the accident involved in this case occurred in Scotts Bluff County, by stipulation of the parties the cause was to be tried in the district court for Cheyenne County on the pleadings filed in the compensation court. Trial was had in the district court. The district court rendered judgment against the plaintiff and dismissed his cause of action. The plaintiff filed a motion for new trial. From the order overruling his motion for new trial, the plaintiff appealed to this court.

There is no apparent dispute in the record as to the following facts: That on June 25, 1957, the relationship between the plaintiff, Loyd S. Tilghman, and R. D. Mills, first and real name unknown, doing business as R. D. Mills Construction Contractor, defendant, was that of employee and employer as defined by the Nebraska Workmen's Compensation Act, and each was subject to its provisions; that on June 25, 1957, the plaintiff was being paid $1.75 an hour for a 40-hour week and time and a half for overtime, holidays, and Sundays, by the defendant; that on said date, while the plaintiff was being transported to work with other employees of the defendant as a passenger in a station wagon, an accident occurred causing the station wagon to overturn and roll, and become demolished; that on said date the plaintiff was on duty and engaged in the work of his employer; that prior to June 25, 1957, while in the employ of the defendant, the plaintiff at all times was physically able to carry on his part of the work and perform his duties as a manual laborer; that the plaintiff had been paid no compensation, nor had any of the medical and hospital bills incurred by him as a result of the accident been paid; that the plaintiff is married and the father of three minor children; that the plaintiff has a physical disability known as a spondylolisthesis which is a forward displacement of one vertebra over another, usually the fifth lumbar over

the body of the sacrum, or the fourth lumbar over the fifth lumbar; and that the plaintiff was 40 years of age at the time of trial, had an eighth-grade country school education, and had no training for any work except common, manual labor.

The plaintiff's petition alleged that on June 25, 1957, the plaintiff, while in the employ of the defendant, sustained personal injuries in an automobile accident arising out of and in the course of his employment, for which injuries the plaintiff is entitled to compensation; that as a result of the accident the plaintiff suffered a physical disability known as a spondylolisthesis resulting in total and permanent disability; that it will be necessary to have surgery to correct such condition; that to do so will require hospitalization; that the plaintiff will continue to have permanent disability after surgery for 6 months and then will have permanent partial disability for the remainder of his life of approximately 10 to 20 percent of his body as a whole; and that the plaintiff has been and will be required to expend sums of money for hospitalization, medicine, and surgery in the future as a direct result of the accident. The plaintiff prayed to recover compensation as provided for by law.

The defendant's answer admitted the overturning of the station wagon in which the plaintiff was a passenger in the course of his employment; denied that the injuries complained of by the plaintiff were the result of an accident arising out of and in the course of his employment by the defendant; specifically denied the nature and extent of said injuries; and contended that any existing spondylolisthesis or intervertebral disc disease was not the result of said accident. The defendant's answer also alleged that the spondylolisthesis of which the plaintiff complained, and the alleged intervertebral disc disease, were a condition preexisting the accident of June 25, 1957, and were unrelated thereto. Defendant prayed for dismissal of the plaintiff's action.

We deem the following authorities pertinent to a determination of this appeal.

Section 48-151, R. R. S. 1943, provides in part: "The word 'accident' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." See, also, Mook v. City of Lincoln, 143 Neb. 254, 9 N. W. 2d 184.

In an action under the Workmen's Compensation Act the burden is on the claimant to establish by a preponderance of the evidence that he sustained a personal injury by an accident arising out of and in the course of his employment. See, Hassmann v. City of Bloomfield, 146 Neb. 608, 20 N. W. 2d 592; Schwabauer v. State, 147 Neb. 620, 24 N. W. 2d 431; Pittenger v. Safeway Stores, Inc., 166 Neb. 858, 91 N. W. 2d 31.

Such facts must be proved by the claimant by sufficient evidence leading to the direct conclusion, or by a legitimate legal inference therefrom, that such an accidental injury occurred and caused the disability. There must be shown a causal connection between an accident suffered by the claimant and the cause of his disability. Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51; Rose v. City of Fairmont, 140 Neb. 550, 300 N. W. 574; Pixa v. Grainger Bros. Co., 143 Neb. 922, 12 N. W. 2d 74.

Symptoms of pain and anguish such as weakness or expressions of pain clearly involuntary or any other symptoms indicating a deleterious change in bodily condition may constitute objective symptoms within the requirements of the Workmen's Compensation Act. Knudsen v. McNeely, 159 Neb. 227, 66 N. W. 2d 412.

It is sufficient to show that the injury and preexisting disease combined to produce disability, and it is not necessary to prove that the injury accelerated or aggravated the disease, in order to satisfy the require-

ment of the statute that the disability arose out of the employment. Skelly Oil Co. v. Gaugenbaugh, 119 Neb. 698, 230 N. W. 688; Sporcic v. Swift & Co., 149 Neb. 246, 30 N. W. 2d 891.

The applicable rule of construction of the Workmen's Compensation Act is that it be liberally construed to the end that its beneficent purposes may not be thwarted by technical refinement of interpretation. Haler v. Gering Bean Co., 163 Neb. 748, 81 N. W. 2d 152.

In considering the sufficiency of the proof, the rule of liberal construction, as it relates to the Workmen's Compensation Act, applies to the law and not to the evidence offered to support a claim by virtue of the law. Anderson v. Cowger, *supra*.

On an appeal to this court in a workmen's compensation case the cause will be considered de novo upon the record before us. Anderson v. Cowger, *supra*.

With the foregoing authorities in mind, we come to a summary of the evidence.

The plaintiff testified that he resided in Sidney, Nebraska; that he was 5 feet 5 inches in height and weighed 140 pounds; that on June 25, 1957, he was employed by R. D. Mills Construction Company which was engaged in setting up oil pumps; that his duties were to set up oil pumps, lay pipe, and do any type of manual labor required in that type of work, including lifting; that prior to working for the defendant he worked for Keith Deaver at the Colton Grain Company sacking millet; that he ran the fanning mill and loaded boxcars; that in loading the boxcars he was required to lift 100-pound sacks and pile them 7, 8, and sometimes 9 high, which was over his head and which he was able to do; that prior to working for Keith Deaver he helped in the construction of the National Guard Armory in Sidney where, in putting on the roof, he used a sledge hammer; and that after the armory was constructed he cleaned the floor, which was covered with dirt and paper over the cement, and wheeled the dirt out in a wheel-

barrow. He further testified that prior to working on the armory he drilled wheat for a farmer by driving a tractor; that prior to that time he stacked 4,800 bales of hay in 4 days for George Baird; that he stacked the hay 13 bales high, lifting them manually; that the above jobs were the same type of manual labor he had done prior to June 25, 1957; that he had no training for any other kind of work; and that he experienced no pain or discomfort in his back in doing heavy manual labor and was in good health prior to the accident.

The plaintiff further testified that on June 25, 1957, he went to work at 7 a.m. He and four other workmen were transported in a station wagon furnished by the employer. He sat in the back seat, behind the driver, with another employee of the defendant. There were 400 or 500 pounds of tools in the aisle and the space behind the back seat. These tools consisted of pipe wrenches, pipe dies, posthole diggers, shovels, and rakes that were used on the job. The driver of the station wagon attempted to pass a truck, and the station wagon began "whipping" and rolled over on the highway. When the station wagon came to a stop, it was resting on its top. The plaintiff endeavored to get out, and the station wagon started to roll again and rolled back onto its wheels. When it stopped, he was tangled up under the tools with the posthole digger between his legs. The back door of the station wagon was open, and the plaintiff finally was able to get out. A great many of the tools were scattered along the road. The station wagon was completely demolished. The plaintiff was unable to state which of the tools struck him. After the accident he was taken to Scottsbluff. When he arrived there, he had to buy a new shirt and overalls because the ones he wore to work were practically destroyed in the accident. He was taken to a hospital where a nurse put a little salve on his arms, and also a piece of tape. He guessed that he had been burned by coffee, as they had coffee in the station wagon. As a result

of the accident he was "shook up." He further testified that he sat around the hospital, and the longer he did so the more stiff he became. To use his expression, he was "bunged up," and his back was hurting. He arrived at the hospital at approximately 9:30 a.m. He was returned to Sidney by the foreman for the defendant who came after the workmen, and arrived home about 6 p.m. He further testified that by that time he was stiff and sore all over, and his pain was getting worse all the time; that he was stiff and sore during the night and unable to go to work the next morning; that he went back to work the second day after the accident, but never did any heavy work after that time; that the first day he returned to work his back hurt and his arm was sore; that he worked 4 or 5 days, but had to lay off, he could not go back to work; and that he told the foreman that he could not return to work. He further testified that he had a conversation with Mills about the accident wherein Mills told the plaintiff that if he could not go back to work Mills would have to replace him. He testified further that he went to see Dr. Taylor 5 or 6 days after the accident, and told the doctor about his back; that he received no treatment for his back; and that the doctor treated him for his arm, but took no X-ray pictures. He testified that he went to see Dr. Dorwart on or about July 24, 1957, at the request of the defendant. Later he was sent by Dr. Dorwart to Dr. Kline of Cheyenne, Wyoming, and placed in a hospital there. He remained in the hospital 7 days, but no surgery was performed on his back. He further testified that since the date of the accident he had done only light work; that he and his brothers did a little farming; that in doing this type of work he had pain in his back, his legs hurt, and he was unable to sleep at night due to the pain; that if he was on his legs too long they became in such condition that he was unable to move them; and that he suffered pain continuously

and had never had such pain or discomfort prior to the accident.

On cross-examination the record shows that when the plaintiff went to work after the accident he did light work; and that in the event the work required back bending, he would have to get on his knees to do it. The plaintiff further testified that after the accident he worked for the defendant on the following days: On June 27, 1957, 10 hours; June 28, 12 hours; July 5, 12 hours; July 8, 8 hours; July 9, 8 hours; July 10, 12 hours; July 13, 10 hours; July 15, 8 hours; July 16, 14 hours; July 17, 16 hours; July 18, 10 hours; and July 19, 15 hours. He detailed what he did relating to his work on each of the days shown above. It appears from the record that no heavy lifting was required in doing the type of work he did during those days, except that if he did any lifting he had to get on his knees to do it as heretofore mentioned.

The plaintiff testified that he gave certain answers to questions in the compensation court, one of which was to the effect that he gave a statement, which is in evidence, to the defendant's counsel on July 1, 1957, to the effect that he was shaken up by the accident and burned on his left arm and back by some coffee in a thermos bottle that was broken in the accident, and another to the effect that he told the doctor in Scottsbluff that he did not believe he got hurt in the accident. The plaintiff admitted that those answers were given by him in the compensation court.

The plaintiff's wife testified that the plaintiff was physically strong and had done manual labor all during their married life, which was for 14 years; that when the plaintiff returned home the evening of June 25, 1957, he looked pale; that during the night he was awake three or four times; that the next morning the plaintiff got out of bed, but was unable to go to work; that he said he was sore all over, his back hurt, and his neck was stiff; that after June 25, 1957, the plaintiff

complained of his back hurting all the time; that he was not able to do much of any kind of work since the accident; that if he did any kind of work, even yard work, his back and legs hurt him and he had to lie down; that he had no such disability prior to June 25, 1957; that he no longer slept well, and walked the floor at night; and that he seemed to be getting worse.

R. D. Mills testified that he lived in Sidney and was a labor contractor engaged in construction work in oil fields; that the plaintiff was employed by him; that on July 19, 1957, he had a conversation with the plaintiff at the defendant's home; that the reason for the conversation was that some time after the accident this witness received a report from the foreman to the effect that the plaintiff was hurt in the accident and unable to carry on his part of the work; that this witness told the plaintiff he wanted plaintiff to see a doctor as he was not able to work; that the plaintiff told this witness that he had to work, that he did not get hurt in the accident, and that he had "had that little old trouble a long time" and "In just a few days it will go back into place and I will be all right." This witness told the plaintiff that he could have been hurt in the accident and that if he had been, he should have treatment.

On rebuttal the plaintiff testified that he did not tell Mr. Mills in the conversation in July 1957 that he had had pain in his back before the accident.

Expert testimony was given for both the plaintiff and defendant. This testimony is quite extensive and we summarize the principal parts thereof.

It appears that many X-ray pictures were taken of the plaintiff and examined by most of the expert witnesses.

Dr. Taylor testified that he was an osteopathic physician who carried on his profession in Sidney; that the plaintiff came to his office on July 1, 1957; and that at that time the plaintiff complained of burns on his left shoulder and arm following an automobile accident.

The doctor treated him for the burns. He next saw the plaintiff on July 3, at which time he treated the burns and gave him treatment for low back pains. Dr. Taylor further testified that on July 6, he checked the burns and released the plaintiff.

Dr. Dorwart, a physician and surgeon who had practiced his profession in Sidney for 22 years, testified that he examined the plaintiff on July 24, 1957. He made a complete examination and took X-ray pictures. He also took additional X-ray pictures of the plaintiff on August 13, 1957. Dr. Dorwart testified that from his examination he felt that the plaintiff had a fracture of the fourth lumbar vertebra, of the right process, and a fracture of the articular facet of the fourth lumbar vertebra. He diagnosed the plaintiff's condition as a spondylolisthesis. He took the X-ray films to a radiologist to confirm his opinion that there were fractures. The radiologist was dubious about Dr. Dorwart's opinion of the fractures. However, Dr. Dorwart testified that he was "unshaken" by the radiologist's opinion as to the fractures. He further testified that on July 24, 1957, when he examined the plaintiff, he felt that plaintiff had a spondylolisthesis, and when the plaintiff returned on August 13, 1957, he felt the plaintiff's condition was about the same; that he saw the plaintiff next on August 26, 1957, and again on September 6, 1957; and that he referred the plaintiff to Dr. Kline, an orthopedic surgeon at Cheyenne, Wyoming. Dr. Dorwart conferred with Dr. Kline as to the diagnosis of the spondylolithesis, to which diagnosis Dr. Kline agreed and expressed the opinion that quite possibly, with rest and exercise, the plaintiff might be able to return to work after a short time. He testified that Dr. Kline hospitalized the plaintiff for a short time, and as soon as the plaintiff became active again his pain and symptoms returned. At that time Dr. Kline said he felt that surgery would be the only means of correcting the problem. Dr. Dorwart further testified that the next

time he saw the plaintiff was on January 6, then on January 20, 1958, and again on January 23, 1959. At that time the spondylolisthesis still persisted, and he felt that it would persist until surgery corrected the condition. He further testified that a spondylolisthesis is a condition whereby there is a slipping forward of one vertebra upon the other. The doctor gave his opinion that a spondylolisthesis could be greatly aggravated by injury and trauma in any number of instances, and as a consequence, in this particular case, he felt it was definitely attributable to the injuries that the plaintiff suffered. He further testified that the plaintiff's disability for any type of work would be 50 percent, but that the plaintiff was not able to do any arduous manual labor and was totally disabled from doing any such type of labor; that the plaintiff's condition would improve with surgery; and that the plaintiff would have a "fairly good chance of reducing his present disability 10 to 20 percent with surgical intervention."

On cross-examination this witness testified that spondylolisthesis is a congenital or predisposed condition of the spine which could be present at the time of birth and might only be brought to the surface with an injury, or when some trauma caused it to do so.

Dr. Hull Cook, a physician and surgeon practicing his profession in Sidney for 21 years, testified that on January 24, 1959, he examined the plaintiff for low back pain and took X-ray pictures. He testified that from his examination he felt that the plaintiff had a spondylolisthesis, the duration of which he was unable to determine, but he subsequently found that it was of long duration and had been quiet, without showing any disabling symptoms. His diagnosis was that there was an irritated or aggravated spondylolisthesis. This doctor was asked a hypothetical question containing substantially the facts as shown by the record relating to the plaintiff, and was asked to give his opinion as to whether or not the accident of June 25, 1957, was the

cause of the plaintiff's present disability. His answer was that the accident served as a precipitating factor to bring about the disability the plaintiff then had. He stated: "We see this, not infrequently, with spondylolisthesis, and could assume congenital back deformities, where a man will go along for many years, getting by comfortably, many times, without being aware that he has any deformity, until some traumatic factor of this nature causes difficulty; and while it is impossible for anyone to say with certainty, just what the situation is, this seems to fall into that pattern quite conclusively." He further testified that his opinion was based upon the facts as shown by the X-rays, the complaints of the plaintiff, and his knowledge of the plaintiff's condition prior to the accident; that it would seem that the plaintiff would be unable to do any heavy manual labor at that time; that the plaintiff's condition would remain permanent unless corrections were made; and that he would expect the plaintiff to have to have a spinal fusion, a surgical operation to fuse together the area which was causing pain, to explore areas where there might be nerve pressure, and relieve the pressure, and with good luck the plaintiff might have an excellent result.

Dr. Claussen, an orthopedic surgeon who practiced his profession at North Platte, testified in behalf of the defendant that he had examined the X-ray films of the plaintiff designated as exhibits Nos. 1 to 10 and 12 to 15, inclusive; and that he had had special training in the reading and interpretation of X-ray films. He further testified that from an examination, exhibit No. 2, an X-ray film, showed the spinous process of the fourth and fifth lumbar vertebrae were closer together than would be expected, and also showed sclerosis; and that exhibit No. 3 showed a defect of the pars interarticularies, which is a congenital defect. He examined the X-ray films taken at De Paul Hospital in Cheyenne, Wyoming, one of which showed that the spondylolisthe-

sis, which had slipped half-way, of the fifth lumbar on the first sacral, and the intervertebral disc space of the fifth lumbar and first sacral vertebrae was completely gone. He also stated that there was evidence of bone building up; that there was a little piece of bone which appeared to have been present for years; that in the area which he examined there was arthritis; and that the bones had been grinding on each other for years. He testified that exhibit No. 6 showed essentially the condition of the spondylolisthesis, with the degenerative arthritis, sclerosis, and loss of disc space. He further testified that the spondylolisthesis could not have been caused by trauma on June 25, 1957, and gave the reasons for his opinion as follows: "The reasons for this are the long-standing degenerative processes that are apparent on the X-rays, between the 5th lumbar vertebra and the 1st sacral. You don't get that amount of degenerative change in a few months' or few days' time; it takes years. Q And does that, or does that not, indicate, Doctor, that the disc space between the 5th lumbar and the sacrum has existed in that condition for a long time, also? A That disc space has been collapsed for a long, long time. Q Antecedent to June 25, 1957? A Yes." He further testified that if the accident of June 25, 1957, caused any aggravation of the man's condition he would expect severe back symptoms within 48 hours from the time of the accident.

On cross-examination this witness testified as follows: "Q It is possible that a spondylolisthesis can be asymptomatic prior to some sort of physical trauma to that area, whatever trauma you would like to describe, even an excessive physical force to that area, which would make that spondylolisthesis symptomatic? A Such is possible."

Dr. Tennant testified by deposition that he was a physician and radiologist practicing his profession in Sterling, Colorado, and a consultant radiologist on the staff of the Cheyenne County Memorial Hospital at

Sidney. The doctor examined the X-ray films taken by Dr. Dorwart and identified the defect of the pars interarticularies as a congenital malfusion, and not a fracture. He testified that sclerosis is a condensation of bone, usually due to repeated stress changes in the bone substance; and that the sclerosis which he observed in exhibits Nos. 2, 3, and 4 indicated repeated, long-standing bone stress. The doctor further testified that by spondylolisthesis is meant the presence of a bilateral defect of the pars interarticularies, associated with a slippage of the vertebra, and that in this case the fifth lumbar had moved in front of the sacrum. He examined the X-ray films from the De Paul Hospital in Cheyenne, Wyoming, and diagnosed what he termed a spondylolisthesis of a second degree, and sclerosis of the sacral plate, and stated that there was no evidence of a healing fracture. The following questions were asked and answers given by this witness: "Q Now Doctor, do you have an opinion as to whether or not pain and disability would immediately follow, if a spondylolisthesis such as you have seen in these X-rays, was traumatically caused? The question is, do you have an opinion? A I have. Q And what is that opinion? A Were it possible to produce a fracture simulating a spondylolisthesis in effect, the clinical manifestations would be extremely severe with regard to pain and disability. Q And they would be immediate, is that correct? A I would say they would be immediate. Q And when you say the clinical manifestations would be severe, what do you mean? A The patient would be unable to carry on normal activities; he would be quite disabled."

It is obvious that the testimony given by the experts is in conflict. However, from a review of all the evidence we conclude that the plaintiff has proved by a preponderance of the evidence that he sustained personal injuries as a result of an accident arising out of and in the course of his employment.

The question arises, what was the extent of the disability the plaintiff suffered?

For workmen's compensation purposes, "total disability" does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do. See, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262; Elliott v. Gooch Feed Mill Co., 147 Neb. 612, 24 N. W. 2d 561.

"An employee may be totally disabled for all practical purposes and yet be able to obtain trivial occasional employment under rare conditions at small remuneration. The claimant's status in such respect remains unaffected thereby unless the claimant is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or any other established field of employment for which he is fitted." Sporcic v. Swift & Co., *supra.* See, also, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262; Crable v. Great Western Sugar Co., 166 Neb. 795, 90 N. W. 2d 805.

In the instant case there is evidence which shows that the plaintiff is unable to perform the duties of his former employment and that he has been totally and permanently disabled to do so. As we view the record, the plaintiff is entitled to recover from the defendant for permanent total disability the sum of $30 a week for the first 300 weeks of such disability, and the sum of $25 a week for the remainder of his life, as provided for in section 48-121, R. S. Supp., 1955.

The record discloses a statement of the De Paul Hospital, Cheyenne, Wyoming, in the amount of $149.65; a statement of Duane M. Kline, Jr., M. D., Cheyenne, Wyoming, in the amount of $38.50; and a statement of C. B. Dorwart, M. D., Sidney, Nebraska, in the amount of $51. However, this doctor testified that the reason-

able value of his services was $97. Dr. Cook testified to the value of his services being $35. The West Nebraska General Hospital of Scottsbluff submitted a statement for $2.45.

As stated in Pittenger v. Safeway Stores, Inc., *supra:* "A recovery by an employee against an employer by virtue of the Workmen's Compensation Act may include the reasonable expenses incident to and necessary for obtaining medical and hospital services."

The plaintiff is entitled to recover from the defendant for the medical and hospital expenses as set forth above.

While the plaintiff in his testimony states that he made three trips to see Dr. Kline at Cheyenne, Wyoming, by direction of Dr. Dorwart, and testifies as to the distance between Sidney, Nebraska, and Cheyenne, Wyoming, he failed to testify as to the amount of expenses incurred in making these trips, consequently, in the absence of competent proof as to the amount expended for such trips, no allowance can be made.

The plaintiff contends that he is entitled to recover an attorneys' fee for services rendered in the district court and in this court, to be taxed as costs under the authority of section 48-125, R. R. S. 1943.

In Lee v. Lincoln Cleaning & Dye Works, 145 Neb. 124, 15 N. W. 2d 330, this court said: "Section 48-125, Comp. St. Supp. 1941 (now section 48-125, R. R. S. 1943), covers the allowance of attorney's fees in compensation cases. In Rexroat v. State, 143 Neb. 333, 9 N. W. 2d 305, the exact point in the instant case was contested, and it was held that, when the employee appeals from an adverse decision in the district court which denied an award of compensation, and this court reverses the district court, and holds that the employee is entitled to compensation, this court is not authorized to allow the employee an attorney's fee under the section of the statute just quoted, and therefore we grant no attorney's fee on this appeal. See Updike Grain Co. v.

Swanson, 104 Neb. 661, 178 N. W. 618." See, also, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262.

In the light of the above authorities we allow no attorneys' fee to be taxed as costs for plaintiff's counsel in the instant case.

The judgment is reversed and the cause remanded to the district court for Cheyenne County with directions to render and enter judgment for the plaintiff and against the defendant in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.