SHARON SMITH, SPECIAL ADMINISTRATRIX OF THE ESTATE
OF LOYD COWMAN, DECEASED, APPELLANT, V. PLUMB
R. STEVENS ET AL., APPELLEES.

114 N. W. 2d 724

Filed April 27, 1962.   No. 35185.

*Neighbors, Danielson & Van Steenberg* and *Beatty, Clarke, Murphy, Morgan, Pedersen & Piccolo*, for appellant.

*Joseph H. McGroarty*, for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

CARTER, J.

This is an action arising under the provisions of the Nebraska Workmen's Compensation Act. The case was first tried before one of the judges of the compensation court, who dismissed plaintiff's claim. The case was then heard by the entire compensation court, which likewise dismissed plaintiff's claim. An error proceeding was

taken to the district court for Scotts Bluff County, where the judgment of the compensation court was affirmed. The plaintiff thereupon appealed to this court.

We shall refer to Loyd Cowman as plaintiff throughout this opinion, irrespective of the revivorship of the action in the name of a special administratrix.

The evidence shows that plaintiff was employed by Plumb R. Stevens for several years prior to April 7, 1958, the date of the first of a series of accidents. Plaintiff was employed by Stevens, a construction contractor, as a cement worker at an hourly rate of $1.50. The ordinary work day was 9 hours and the work week was 5½ days. Plaintiff worked when there was work to be done and the weather permitted. Plaintiff was 63 years of age at the time of the incidents giving rise to this litigation.

On April 7, 1958, plaintiff, while unloading steel forms for Stevens, mashed his left thumb. Blood poisoning set in which required his hospitalization for 11 days. He was paid compensation benefits for this injury.

On May 24, 1958, after returning to his employment, he slipped while unloading some 2 x 4's used for constructing cement forms. While carrying the 2 x 4's on his right shoulder the slipping occurred, causing him to fall on one knee. As he got back on his feet the 2 x 4's scissored and kinked his neck. He told his foreman that evening of the kinking of his neck. There was no work the next 2 days. He returned to work on May 27, 1958, as usual.

On the latter date the work crew was engaged in lining an irrigation lateral with cement. After shoveling the mixed cement upon the sides of the lateral, plaintiff and three other employees were smoothing it out with an implement referred to in the record as a strike-off. The strike-off was a form, fitting the inside contour of the lateral which smoothed the cement in the bottom and on the sides of the lateral. It rested on 2 x 4's laid parallel on each side of the lateral. Two

employees pulled on the tongue of the strike-off while two other employees held the strike-off down and pushed on it from the rear. Plaintiff was on his hands and knees pushing the left end of the strike-off when it hit an obstruction, probably an uneven joint in the 2 x 4's on which the strike-off rested. Plaintiff's right hand and arm went through the strike-off into the wet cement and plaintiff fell partially into the lateral. He jerked his arm and head back and as he did so, according to his testimony, he suffered a stabbing pain in his neck between his shoulder blade and spine. He was unable to work the balance of the afternoon and rested in the shade until the crew quit for the day. He suffered pain throughout the night. He applied liniment and heat to his neck. He sat up all night because of extreme pain when he laid down. He returned to the employer's tool yard for work the next morning and went to Dr. Stuart Wiley's office when the doctor arrived at 11 a.m. The testimony of plaintiff as to the accident is corroborated by other employees.

The happening of the accident is established by the record. The evidence establishes that plaintiff at the time of the hearing before the one judge of the compensation court was totally and permanently disabled from performing the kind of work he was qualified for and customarily performed. The issue before the court is whether or not a causal connection exists between the accident and the resulting disability. The plaintiff contends that the disability is the result of the accident within the meaning of the Workmen's Compensation Act. The defendants assert that the disability is the result of disease in which trauma played no part. The conclusion of the court must rest on medical findings and the opinions of medical experts.

The case is heard de novo in this court. The burden of proof is upon the plaintiff to prove an accident arising out of and in the course of his employment and the disability resulting therefrom. Plaintiff must show a causal

connection between the accident suffered by him and the alleged disability. It is sufficient to show that the injury and preexisting disease combined to produce disability. These rules are of long standing and we shall not elaborate on them in this opinion. Tilghman v. Mills, 169 Neb. 665, 100 N. W. 2d 739.

The evidence of Dr. Wiley, the attending physician, is substantially as follows: He first saw the plaintiff on April 10, 1958, after plaintiff had mashed his thumb on April 7, 1958. The thumb became infected, which necessitated hospitalization and treatment for blood poisoning from May 5 to May 16, 1958. He found no heart murmurs or any discernable enlargement of the heart at this time. He found that plaintiff had an emphysematous chest of long standing which he associated with the limitations of excursions of respirations. There was no excessive fluid in the chest and his blood pressure was normal. He found no abnormalities in the heart, lungs, or thoracic cavity during this period.

He next saw plaintiff on May 28, 1958, the day after the accident with the strike-off, when plaintiff came to his office complaining of dizziness, pain, and stiffness in his neck. His examination revealed that plaintiff's blood pressure was normal. The heart, lungs, and thoracic cavity appeared normal. He discovered fine rales in the lungs and a shortness of breath. There was no fracture or dislocation of the bone structure, but he found evidence of advanced osteoarthritis of the cervical spine. Plaintiff entered the hospital on June 10, 1958, at which time he was suffering extreme pain in the neck area, a shortness of breath, bodily weakness, limitation of motion, rales in the lungs, and a mild cardiac enlargement. There was some peripheral edema and some fluid in the lungs. He was placed in traction and treated by physiotherapy. He was also treated for a decompensated heart. The plaintiff became progressively weaker until he became a bed patient. On August 5, 1958, Dr. Leon Schreiner, a neurologist practicing in Cheyenne, Wy-

oming, was in the hospital on other business and was asked by Dr. Wiley to look in on the plaintiff. Dr. Schreiner gave Dr. Wiley a tentative diagnosis of degenerative spinal cord damage, possibly amyotrophic lateral sclerosis, which is an incurable disease that progresses to inevitable death without any significant improvement at any time. Dr. Wiley agreed with Dr. Schreiner, advised plaintiff that further hospitalization would be ineffective, and discharged him from the hospital. Plaintiff thereupon entered a resthome in North Platte. On October 16, 1958, Dr. Wiley again saw plaintiff at which time he showed a remarkable improvement. Plaintiff was able to walk and his arms were much stronger. Dr. Wiley testified that his improvement was so pronounced as to be inconsistent with amyotrophic lateral sclerosis and consistent with a traumatic neck injury with spinal cord damage. On March 24, 1959, Dr. Wiley again saw plaintiff. He showed further improvement. He breathed well. His heart was compensated, although there was some enlargement. It was Dr. Wiley's opinion that plaintiff's condition was the result of trauma to his cervical spine area and associated structures.

Dr. Schreiner testified to his tentative diagnosis on August 5, 1958, of degenerative cord disease with other closely related syndromes possible. On January 16, 1959, he made a complete examination and diagnosis of plaintiff's ailments. Due to the great improvement in plaintiff's condition he ruled out the presence of a degenerative central nervous system syndrome, including amyotrophic lateral sclerosis. His diagnosis was that plaintiff was suffering in part, at least, from a post-traumatic cervical spine injury in which trauma is a contributing factor. He testified further that he found no objective evidence by laboratory or neurologic tests of Guillain-Barre syndrome which defendants assert as the sole cause of plaintiff's disability. He stated further that plaintiff's condition could be explained only on

the basis of a traumatic injury to the cervical spine and associated soft tissues, including the nerves and spinal cord.

Dr. Charles F. Heider, Sr., first saw plaintiff in a North Platte nursing home on August 11, 1958. On November 24, 1958, he took X-rays of the cervical spine. He found a marked osteoarthritis of that area and a narrowing of some of the vertebral discs. He found definite evidence of heart disease and advanced arteriosclerosis for a man of his age. He gave as his opinion that plaintiff suffered an acute traumatic condition to his spinal cord at the time of the accident.

Dr. Harold A. Ladwig, a neurologist practicing in Omaha, was called by the defendant. He examined plaintiff on July 25, 1959. He testified that at the time of Dr. Schreiner's examination of plaintiff on August 5, 1958, it was his opinion that plaintiff was suffering from an inflammatory disease known to the medical profession as Guillain-Barre syndrome. He found a shortness of breath and a congestive heart failure. He also found a grade I narrowing of the arteries which was consistent with plaintiff's advanced arteriosclerosis. He found a limitation of movement in both shoulders and the joints of the hands. He found some atrophy of the hand muscles, although plaintiff had an 80 percent grip. Certain reflexes were weak, which could have been normal in a man of his age. There was a definite limitation of movement of the neck. He found no evidence of injury to the spinal cord. He found fibrillations in the shoulder girdle which, accompanied by muscle weakness, is consistent with Guillain-Barre syndrome. He pointed out that there were no manifestations of a long track involvement which is present in a cord injury, and would give rise to hyperactive reflexes, slowness, and abnormal toe signs which plaintiff did ·not show. He pointed to the fact that plaintiff did not have a loss of bowel and bladder control which is contrary to a finding of cord injury. The conclusion reached

was that the injuries sustained in the accident would not produce injury to the spinal cord nor damage the cervical nerve roots and produce the symptoms testified to. Dr. Ladwig testified that the cause of Guillain-Barre syndrome is unknown. It is an inflammatory cord disease as distinguished from a degenerative cord disease such as amyotrophic lateral sclerosis. Infection often precedes Guillian-Barre syndrome according to Dr. Ladwig, but he did not feel that the blood poisoning which developed from the mashed thumb was a specific cause. He pointed out that recovery is common in cases of Guillain-Barre syndrome and that it is not in degenerative cord diseases. His opinion is that the existing arteriosclerosis, osteoarthritis, and the accidents testified to were coincidents, and that the sole cause of plaintiff's disability was Guillain-Barre syndrome.

Dr. Edmond M. Walsh, a physician specializing in diagnosis and internal medicine, examined plaintiff on and following July 22, 1959. He stated that plaintiff appeared older than his age. His examination revealed a limitation of movement of the head, a clear lung field, a moderately enlarged heart with sounds distant with no murmurs, and some disturbance of the lower extremities due to arteriosclerosis. He had a high red blood count and an excess of hemoglobin which could produce dizziness, shortness of breath, fatigue, and minor strokes. He stated that the foregoing could have been influenced by long standing congestive heart failure. By X-ray he found a spurring of the vertebral bodies and a calcification of the upper cervical lymph nodes due to plaintiff's arteriosclerotic condition. Plaintiff's heart was doing well at the time of his examination. He attributes the heart condition to a severe infection. He found no evidence of a degenerative cord disease or cervical nerve injury. He found plaintiff's blood pressure to be high. His opinion is that plaintiff had Guillain-Barre syndrome and that he was disabled by arteriosclerosis and cardiac damage. In his opinion the dis-

ability of plaintiff was not attributable to any accident. He refused to state, however, that a severe injury would not contribute to plaintiff's condition following the accident.

We have attempted to fairly summarize the findings and opinions of the medical experts without describing all the clinical and laboratory tests sustaining their conclusions. It is from these conflicting medical opinions that we must determine if there was a causal connection between the accident and the disability. The value of the opinion of an expert witness is dependent on and no stronger than the facts on which it is predicated. Such an opinion has no probative force unless the assumptions upon which it is based are shown to be true. In resolving conflicts in expert testimony a court is required to weigh and consider the evidence the same as any other conflict in the evidence on a material fact.

The evidence shows that plaintiff suffered an accident arising out of and in the course of his employment on May 27, 1958, which produced objective symptoms of injury. The symptoms continued and the disability existed unabated until the time of trial. The evidence of the attending physicians and the medical expert who examined him first during the period of disability is that trauma was a contributing cause of the disability. Their evidence appears to be both logical and credible.

The medical experts who testified for the defendants state that they found no evidence of injury to the spinal cord or the nerve root processes of the spinal area when they examined plaintiff more than a year after the accident of May 27, 1958. They assert that plaintiff's disability is due to Guillain-Barre syndrome and that the accident was not a contributing factor. Both admit that the cause of Guillain-Barre syndrome is unknown, which does not rule out accident as a contributing cause. One of defendant's experts testified that the accident as he understood it was not, in his opinion, a factor in the case, but he would not testify that trauma of a more

serious nature than he understood the accident to have been would not, or could not, be a contributing cause. The medical evidence of defendants appears to be more speculative and conjectural than that of the plaintiff. The medical experts all agree that symptoms of degenerative cord damage and inflammatory cord disease are quite similar in many respects. It is not disputed that improvement and recovery occur in inflammatory cord damage, due to its basic character as an infectious disease. The evidence shows the plaintiff did have a serious case of blood poisoning a few weeks before May 27, 1958. It appears just as logical to say that improvement and recovery could occur in traumatic injury to the spine or the nerve processes of the spinal area. The existence of advanced arteriosclerosis and osteoarthritis appears to be conditions and not predisposing factors. The history of heart decompensation and shortness of breath, according to the medical testimony, could well have been secondary results of the blood poisoning, or spinal or nerve injuries. While it is true that the accidents, physical conditions, and the symptoms indicating disability, could have been coincidents, it does not seem at all probable in a man who had no knowledge from experience or information of any latent disease or physical impairment. After giving due consideration to all the evidence, the history and nature of the accident, and the sequence of events following the accident, we are of the opinion that the evidence of plaintiff preponderates over that of the defendants and that plaintiff was totally disabled because of injury within the meaning of the Workmen's Compensation Act.

We find that plaintiff was totally and permanently disabled and entitled to the benefits of such disability authorized by the workmen's compensation law. An order of revivor appearing in the record shows that plaintiff died on December 24, 1960, during the pendency of this litigation. The cause of death is not shown. See § 48-123, R. R. S. 1943. There is no evidence of de-

pendency in the record. See §§ 48-122 and 48-124, R. R. S. 1943. We are unable to fully determine from the record the rights of the parties under the circumstances shown. We deem it appropriate under the circumstances to reverse the judgment and remand the cause to the district court with instructions to remand the same to the workmen's compensation court to determine the rights of the parties, the amount of compensation, and the medical, hospital, nursing home, and other expenses to which plaintiff is entitled, and to make a proper award of same.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.