246

ANTON SPORCIC, APPELLEE, V. SWIFT & COMPANY, A
CORPORATION, APPELLANT.
30 N. W. 2d 891

Filed February 6, 1948.   No. 32381.

*Rosewater, Mecham, Shackelford & Stoehr*, for
appellant.

*Eugene D. O'Sullivan, Arthur J. Whalen*, and *Eugene
D. O'Sullivan, Jr.*, for appellee.

Heard before SIMMONS, C. J., PAINE, MESSMORE,
YEAGER, CHAPPELL, and WENKE, JJ., and WESTERMARK,
District Judge.

MESSMORE, J.
This is an appeal from a judgment of the district

court for Douglas County granting compensation to the plaintiff under the Workmen's Compensation Act. The cause was originally tried before a judge of the Nebraska Workmen's Compensation Court and dismissed September 19, 1945, for want of sufficient evidence to sustain the finding that the plaintiff's disability was caused by or due to an accident while in the course of his employment. On October 2, 1945, or within 14 days from the date of the dismissal of the cause, the plaintiff filed a petition in the district court setting forth his employment; the factual situation with reference to the accident; the disabilities received therefrom; the wages he was earning at that time; and praying for compensation, medical and hospital expenses and other and further relief. The petition further alleged that the judge of the Workmen's Compensation Court erred in dismissing the plaintiff's cause, and in due time the plaintiff waived a rehearing before the Nebraska Workmen's Compensation Court and gave notice of appeal to the district court.

The defendant filed a special appearance objecting to the jurisdiction of the district court over the subject matter for the reason that no lawful, proper, or sufficient petition was filed by the plaintiff in the district court within 14 days after the order of dismissal made by the Workmen's Compensation Court.

The defendant argues that plaintiff's petition in the instant case failed to have attached to it the pleadings and orders of the Workmen's Compensation Court as required by law, citing Hansen v. Paxton & Vierling Iron Works, 135 Neb. 867, 284 N. W. 352, to the effect that the petition on appeal in the cited case, from the compensation court, included a copy of the pleadings before the Workmen's Compensation Court, setting forth the issues, and also the order of dismissal of the Workmen's Compensation Court.

In the instant case the petition was amended by interlineation to include the petition, answer and order

as exhibits to be attached to the petition, which was apparently after the 14-day period.

In the cited case, followed by Bell v. Denton, 136 Neb. 23, 284 N. W. 751, there was no specific requirement that the pleadings, orders and findings of the Workmen's Compensation Court be attached to the petition on appeal. Section 48-181, R. S. Supp., 1945, which provides for direct appeal when rehearing is waived before the Nebraska Workmen's Compensation Court to the district court, makes no such requirement that such pleadings, orders or findings be attached to the petition on appeal to perfect such appeal where the petition sets out the errors of the compensation court and alleges that rehearing was waived and notice of appeal given in due time.

The trial court did not err in overruling the special appearance.

After trial de novo in the district court, the court decreed that on October 10, 1944, the plaintiff, while in the employ of the defendant, earning wages in excess of $40 per week, received personal injuries caused by an accident arising out of and in the course of his employment; that as a result of the accidental injuries plaintiff was temporarily, totally disabled from October 10, 1944, to November 22, 1944, and had been paid all compensation due him from the defendant for said period of time; that the plaintiff, as a result of the accidental injuries, "has been totally and permanently disabled from the 22nd day of May, 1945, until the present time, and will be totally and permanently disabled for the remainder of his life and is entitled to receive the sum of $15.00 per week from the defendant beginning May 22nd, 1945, for a period of 300 weeks from said date and thereafter the sum of $12.00 per week for the remainder of his life, as and for total permanent disability"; and, further, that defendant pay to Dr. Willard H. Quigley the sum of $200 and to Dr. Fred J. Schwertley the sum of $25, and pay to plaintiff the

additional sum of $86.40 paid by him as necessary hospital and medical expense.

Upon the overruling of a motion for new trial, the defendant appeals.

For convenience, the appellant will be referred to as the defendant and the appellee as the plaintiff.

The defendant contends that the plaintiff has failed to prove by a preponderance of the evidence that he has an ailment caused by accidental injury sustained in the course of and out of his employment.

It appears from the record that the plaintiff, 36 years of age, was employed by the defendant intermittently from 1933 to 1936, and more steadily from 1939 until about May 27, 1945. He worked as a bacon slicer, using a machine to do the slicing. The bacon was kept in a cooler about 15 feet distant from where he worked. On October 10, 1944, at approximately 2:45 in the afternoon, he was going to the cooler to get some more bacon to slice. He opened the cooler door, which was five or six inches thick and weighing between 250 and 300 pounds, by pulling the door toward him. At the same time his immediate supervisor opened a door in close proximity to the cooler door, and pushed it, the result being that the plaintiff was caught between the two doors, the cooler door striking him in the chest and the other door in the back, placing the plaintiff in what has been called a "squeezing" position. He received injuries to his back, causing severe pain. About 3:30 p.m. he went to see the nurse employed by the defendant. She told him to return the next morning. He was then sent to Dr. Hansen who applied heat treatments, and then to Dr. Hill who gave no treatments but took some X-ray pictures. The casualty representative of the defendant then sent him to Dr. Johnson, where he received some heat treatments. The doctor later taped his back and then subsequently removed the tape and applied more heat treatments.

The plaintiff received compensation for a period of

six weeks for total, permanent disability. Thereafter Dr. Johnson taped his back and fitted him with a brace which apparently helped him. He returned to work and was assigned to a different type of work, that is, nailing box lids and stamping the boxes with a machine. He testified that he suffered pain in the left side and lower ribs, which bothered him when he did any bending. On account of the pain, he left his employment on or about May 27, 1945. On May 26, 1945, he went to see his family doctor, for the reason that the casualty representative of the defendant informed him there was nothing wrong with him and the doctor had released him. The family doctor sent him to a hospital where he was given penicillin treatments, and also applied a cast from his hip joints up to and under the shoulder blades. He wore the cast for three months, when it was removed. He was then fitted with a canvas belt with steel braces. The belt was 14 to 16 inches in width. He wears the belt most of the time, and is unable to do any lifting.

It further appears from the record that the plaintiff was injured in an automobile accident about December 22, 1941. As a result of such injuries, he filed a petition for damages in the district court. This petition was introduced in evidence by the defendant. It alleged in part, in substance, that the plaintiff received a severe sprain of the sacroiliac joint and of the lumbosacral joint, causing permanent disability which could not be determined at that time. This case has not been tried. On October 11, 1944, the plaintiff signed a statement wherein he said, in part, that about two and a half years previously he suffered a back injury in an automobile accident for which he took treatments, the last one being four or five months previous to the present accident, and that the X-rays showed nothing except strains at that time.

Plaintiff further testified that when he returned to work he received 73½ cents per hour, which constituted

his basic pay for 40 working hours per week; that previous to the accident, doing piece work, he averaged $45 per week; that he wore an elastic belt about seven inches in width after the automobile accident, but was not wearing it in October 1944.

The plaintiff's wife testified, in substance, with reference to the automobile accident in which the plaintiff was involved in December 1941, that he complained of pain and she would massage him in the evening, and did so for about five or six months; thereafter he did not complain of pain very much; and that he did wear an elastic belt for awhile. She testified that after the accident in October 1944, the plaintiff complained of severe pain, and would walk stiffly back and forth through the rooms; that he was unable to sit down for long periods of time, and felt better walking; that he did very little around the house; that he slept badly at night and it was hard for him to get out of bed; and that he sat more on the edge of a chair with his legs stretched out, to enable him to have comfort.

Since the plaintiff quit the employment of the defendant, he has been assisting some relatives, keeping books, cashing checks, and occasionally serving drinks in a bar, for which he receives $25 per week. He works three or four hours a day, at different times of the day, when he feels like it, and the relative testified that the employment and the pay therefor is a donation, for the benefit of his family. There is also evidence that previous to his employment with the defendant, he, at times, tended bar for other persons.

Dr. Willard H. Quigley, the family doctor, testified that he had known the plaintiff for years, and that he suffered an injury to his sacroiliac joint from an automobile accident in 1941. With reference to the accident which occurred on October 10, 1944, the doctor testified he examined the plaintiff May 26, 1945. He took into consideration the history of the case, the details of the accident, and the medical treatment of doctors

who had treated him for the injuries sustained in the accident, and saw the brace that had been prescribed for the plaintiff by Dr. Johnson. He further testified that the plaintiff complained about aggravating pain in the upper back at the tenth, eleventh, and twelfth thoracic vertebrae located where the lower ribs are attached, high up in the back, and near the sacroiliac joint which is down near the sacrum, in the lower part of the back where the sacral joins with the fifth lumbar vertebrae, near the hips. One of the exhibits, an X-ray, the doctor testified, shows a very destructive process between the tenth and eleventh thoracic vertebrae where the bone of the lower portion of the tenth thoracic vertebrae is plainly destroyed. There is also a narrowing between the intervertebral spaces which may and of course probably does involve the intervertebral discs. There is also some destructive process in the eleventh and twelfth thoracic and first lumbar vertebrae. The principal injury is between the tenth and eleventh thoracic vertebrae. He pointed to a marked place on the exhibit to show an irregular and jagged outline, compared with the other vertebrae. He testified to a destructive process to the lower portion of the tenth thoracic vertebrae and irregular destructive process in the eleventh and twelfth thoracic vertebrae, by another X-ray exhibit. By examination of the plaintiff he found that plaintiff's motion was limited, painful, and incapacitating pain and tenderness over the lower thoracic vertebrae, hurting him on bending forward and backward and sitting up. His diagnosis was that there existed an aggravating traumatic back condition with probable osteoarthritis. He informed the plaintiff that he did not think the plaintiff had any hope of getting results without an ankylosis of the spine, which means stiffening or destroying the movability of the joint and making it stiff. The plaintiff was sent to a hospital, given penicillin, and put in a body cast. He was there from July 1 to July 5, and again from July

22 to July 29. He wore the body cast for about three months. The results were not gratifying. The purpose of the body cast was to give the plaintiff rest and probably help to cure an existing inflammatory condition, if there was one, and to cause an ankylosis of the spine. The doctor recommended a belt in the nature of a rigid leather or metal corset. The diagnosis the doctor made at the time of the examination was that the plaintiff was suffering with a traumatic arthritis, traumatic injury to the tenth, eleventh, and twelfth dorsal vertebrae and the first lumbar. The best treatment would be a bone splint which would probably enable him to do some work at gainful occupation. At that time he could do light work, but he complained that his back tired after two or three hours, and he had trouble sitting down; that the pain in his back was enough to incapacitate him; that he could not do any heavy lifting for any length of time; that he had very little range of motion in his back; and his ability to bend forward was practically nil. The doctor also testified that in raising his legs a certain height there would be a definite pull on the lumbar muscles and nerves, causing pain; and that he was totally disabled to do heavy work.

On cross-examination this doctor testified that the plaintiff had influenza and a streptococcic throat, which were infectious; that he presumed he remembered when the plaintiff slipped at home and wrenched his back on May 23, 1943; that he filled out a report on October 16, 1943, for the plaintiff on account of a sprained lower back, cold, and complications such as influenza, pain in the joints and back; that plaintiff was laid off from October 16 to November 1, 1943; that the plaintiff wore a belt prescribed by the doctor after the automobile accident, and that the doctor mentioned a sprained lower back as constituting his diagnosis on October 16, 1943; that on February 22, 1944, the doctor made a diagnosis of a streptococcic infection in the plaintiff's

throat; that the plaintiff had a preexisting arthritis before October 10, 1944; that the pain in the plaintiff's back was constant and aggravated by lifting and bending, and plaintiff was, in fact, physically unable to work from February 28, to April 18, 1944; and that he was afflicted with a streptococcic throat and acute rheumatism. On June 2, 1944, this doctor attended the plaintiff for migrating infection following pneumonia, and the plaintiff was unable to work due to quinsy and arthritis until about July 10, 1944.

Dr. F. J. Schwertly testified for the plaintiff that he examined him on or about July 23, 1945, and found tenderness in his back and pain on motion. He related the history of the accident, and testified that the plaintiff had been wearing a brace which he felt was too loose and if the plaintiff was immobilized by a snug-fitting cast it would give him relief from constant pain, so they applied a snug-fitting cast and gave him penicillin. He further testified that the X-ray showed a narrowing between the ninth and tenth dorsal vertebrae and at the bottom of the eleventh, caused by trauma connected with the accident of October 10, 1944. The doctor gave his opinion that the plaintiff was 100 percent disabled from performing the duties of his former occupation.

Dr. George M. Hansen testified for the defendant, that he examined the plaintiff October 11, 1944, and found no indication of ecchymosis or bruising or swelling to either the chest or the back.

Dr. Herman F. Johnson testified that on October 23, 1944, he examined the plaintiff and at that time there was no evidence of bruises, swelling or ecchymosis; and that there was no evidence of fracture or dislocation. He, the plaintiff, had a congenital abnormality of the lumbar spine and claimed a low back pain, but there was no positive evidence of trauma. A brace to give support to the lower back was recommended. The doctor was informed of the history of the automobile

accident; and that according to the record and history of the mechanism of the injury of October 10, 1944, it was to the mid-chest and mid-back region, while pain complained of was with reference to the low back, especially where he had a congenital condition. He testified that the compression which the plaintiff claimed was sustained on October 10, 1944, had nothing to do with the symptoms in the plaintiff's lower back; and that the pain complained of, as shown by the plaintiff's petition in the automobile damage case, would account for the low back symptoms, and the congenital condition would aggravate such symptoms. This doctor saw the plaintiff for the last time on May 9, 1945, and gave as his opinion that at that time he had completely recovered.

On cross-examination this doctor testified he prescribed a low back brace and recommended a plaster cast at one time, but there is no record that this was applied; and that the plaintiff was totally disabled at the time. On May 9, 1945, the plaintiff was still complaining, and the doctor recommended discontinuing the physiotherapy, heat, and massage. There was evidence of arthritis in the upper lumbar spine. From an exhibit, the doctor testified that the condition as described by him showed a congenital abnormality in the lumbo-sacral spine, and some lipping or growth of new bone along the margins of the first lumbar. The doctor further testified that certain types of trauma localize arthritis, but not the type the plaintiff had, because this was more a compression of his trunk, a squeezing, rather than an actual injury to the spine, which in that region is pretty well protected from a squeezing injury or a compression type injury; and that the condition would not be aggravated or localized by trauma, but would be more apt to be aggravated by a twisting type of injury, or pulling type of injury.

This doctor testified that from the description of the compression injury received from the plaintiff, appar-

ently he was caught between flat surfaces which would be more apt to produce major pressure on the chest and muscles of the back, than on the spine. His spinal symptoms were independent of that type of injury, and he did not see how they could produce the spinal symptoms.

In examining an exhibit upon which a mark was placed identifying the plaintiff's complaint of pain which was between the eleventh and twelfth dorsal vertebrae, the doctor said there was productive change or overgrowth of bone, and some narrowing of the space between the eleventh and twelfth dorsal vertebrae; that it was a part of this arthritic change which had produced some narrowing and degeneration of the disc between the two vertebrae; that there was no destruction of the bone between the eleventh and twelfth dorsal vertebrae; and there were productive changes along the margins.

Dr. J. E. Courtney testified for the defendant that after getting the plaintiff's history and examining the X-rays, he concluded that the plaintiff was not suffering from a compression injury occurring October 10, 1944; that plaintiff could work as a bartender without difficulty, and as a cashier, but would have distress with his back at the end of the day because of his congenital conformation; he detected no evidence of any serious injury, of a compression injury between the chest and the back; that the plaintiff could do average lifting; that there is an absence of any definite findings of bone injury; that the accident itself entailed a squeezing in an upright position, whereas spinal injuries come from a twisting or sudden bending, not from a compression; and the finding of the congenital abnormality as outlined, led to the conclusion that the present backache and the present disability were due to that condition. The trauma in the chest squeezing incident had no part in producing plaintiff's present physical condition as to his back or chest. This doctor concluded that the congenital condition was

the cause of the disability, and that arthritis was incidental to it.

On cross-examination this doctor was asked to explain the fact that the plaintiff worked at heavy work from 1939 to 1944, steadily, except for short periods of illness due to colds or influenza or something like that, and then apparently could not work for a period of seven weeks immediately following the accident. His answer was: "Then it would be only logical to conclude that it was due to his back being sore and painful from his accident." He was then asked, "And if he was then partly disabled following that, and went back to work and did light work, would your conclusion still be the same, that it was due to the accident?" The answer was "Yes, sir."

We have set forth in considerable detail the testimony of the medical experts which is in direct conflict and, as far as the record stands at this time, such opposing medical experts have testified on the one hand that the plaintiff is totally disabled from the accident involved, and will continue so indefinitely; on the other, that he has absolutely no existing disability from the accident.

It is apparent from the record that on October 10, 1944, the plaintiff suffered an injury due to an accident arising out of and in the course of his employment. We are here concerned with the degree of disability suffered, and its extent.

According to the defendant's medical experts, the injuries about which the plaintiff complains could not have occurred by virtue of the accident of October 10, 1944, for the reason that the accident entailed a "squeezing" when the plaintiff was in an upright position, and spinal injuries of the nature and kind about which the plaintiff complains come from a twisting or sudden bending of the body, and not from a compression; and that the congenital abnormality existing in the plaintiff's back is the cause of the present disability. While the evidence

is not clear as to whether or not the plaintiff, when he was caught in a trap between two doors, twisted his body or suddenly bent in some direction, it seems only reasonable and natural that a person so trapped would endeavor to extricate himself, which the plaintiff obviously did, and in doing so, the very position in which he was caught, as shown by the testimony, would indicate that he would twist his body, or bend it, to escape.

It appears from the evidence that the plaintiff at various times had infectious diseases and had suffered injury from a prior accident; also that he had an arthritic condition to his spinal column prior to the occurrence of the accident of October 10, 1944, which created no noticeable impairment of the strength or use of his back during the course of his employment. After the accident and injury complained of, an impairment commenced, and the injuries received were ample cause of the same, irrespective of the preexisting arthritic condition. The disability of the plaintiff at least amounts to a traumatic arthritis which, under the facts in this case, must be deemed to have arisen out of and in the course of the employment of the plaintiff, and therefore is compensable.

The following authorities are applicable in principle to the case at bar.

"In making a case for compensation under the workmen's compensation law, more than a preponderance of evidence is not required." Chatt v. Massman Construction Co., 138 Neb. 288, 293 N. W. 105.

"To sustain an award in a workmen's compensation case, it is sufficient to show that an injury, resulting from an accident arising out of and in the course of the employment, and preexisting disease combined to produce disability." Yakal v. Henkle & Joyce Hardware Co., 145 Neb. 365, 16 N. W. 2d 531. See, also, Gilcrest Lumber Co. v. Rengler, 109 Neb. 246, 190 N. W. 578; Skelly Oil Co. v. Gaugenbaugh, 119 Neb. 698, 230 N. W. 688; Chatt v. Massman Construction Co., *supra;* City of Omaha v. Casaubon, 138 Neb. 608, 294 N. W. 389; Palmer v. Sample,

141 Neb. 36, 2 N. W. 2d 583; Maul v. Iowa-Nebraska Light & Power Co., 137 Neb. 128, 288 N. W. 532, on rehearing, 137 Neb. 137, 289 N. W. 767; Dymak v. Haskins Bros. & Co., 132 Neb. 308, 271 N. W. 860.

It is obvious that the evidence in the instant case is irreconcilable and in direct conflict. This being true, this court will consider the trial court's observation of the witnesses and their manner of testifying, and also that the trial court must have accepted one version rather than the opposite. See Peterson v. Winkelmann, 114 Neb. 714, 209 N. W. 499; Graham Ice Cream Co. v. Petros, 127 Neb. 172, 254 N. W. 869.

The defendant predicates error on the ground that no proper or sufficient foundation was laid as to the services, or reasonable value of the services, of Dr. Willard H. Quigley, Dr. James Kelly, or the hospital and medical services. Dr. Quigley gave his opinion as to the reasonable value of such services. He was familiar with the services, as he rendered services himself, and the hospital items were under his direction. He also knew about the charge made by Dr. Kelly, as being reasonable.

Persons engaged in performing services of the character performed by the plaintiff's physician and who have knowledge of the business in and for which the services have been rendered, and of their value, may give their opinion as to the value of the services. See 32 C. J. S., Evidence, § 545, p. 320; 20 Am. Jur., Evidence, § 901, p. 757; In re Estate of Baker, 144 Neb. 797, 14 N. W. 2d 585.

The defendant contends that if there is any liability in this case the basis of allowance would be as determined in Micek v. Omaha Steel Works, 136 Neb. 843, 287 N. W. 645, that is, on a basis of payment of compensation for partial disability in the amount of 66⅔ percent of the difference between the basic wages received at the time of the alleged injury of $29.40 per week, and the basic wages and earning power of the plaintiff there-

after wherein he earned $25 per week as heretofore indicated by the evidence.

There were two questions determined in the Micek case, *supra*: First, was Micek partially or totally disabled? Second, what rate of compensation should he receive? On the first question it was determined that Micek was not totally disabled, and in reaching that conclusion his then ability to earn in another field of employment was considered. Here, there has been a final determination that the plaintiff was totally and permanently disabled, and there is no evidence to show that he is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or in any other established field of employment for which he is fitted. Until such facts are established or shown by competent evidence, the Micek case does not apply. See Yakal v. Henkle & Joyce Hardware Co., *supra*.

The fact that the plaintiff has been doing light work does not bar him from recovering compensation. In Elliott v. Gooch Feed Mill Co., on rehearing, 147 Neb. 612, 24 N. W. 2d 561, this court held: "An employee may be totally disabled for all practical purposes and yet be able to obtain trivial occasional employment under rare conditions at small remuneration. The claimant's status in such respect remains unaffected thereby unless the claimant is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or any other established field of employment for which he is fitted."

Section 48-125, R. S. 1943, provides, in substance, that in the event an employer appeals an award from the district court, which is in favor of an employee, to the Supreme Court and fails to obtain any reduction in the amount of such award, the Supreme Court may allow the employee a reasonable sum for attorney's fees for proceedings in such court. We fix the attorney's fees in the sum of $250 for services rendered by plaintiff's attorneys in this court.

According to the record, the total permanent disability of the plaintiff was ascertained on May 26, 1945. We modify the court's decree to read May 26, 1945, instead of May 22, 1945.

Other errors raised by the defendant are without merit. The decree of the district court is affirmed as modified.

AFFIRMED AS MODIFIED.