LEE HAGLER, APPELLEE, v. THORVAL JENSEN AND STANLEY JENSEN, DOING BUSINESS AS ARNOLD LIVESTOCK COMMISSION COMPANY, A PARTNERSHIP, ET AL., APPELLANTS.

114 N. W. 2d 755

Filed April 27, 1962. No. 35166.

*Stewart & Stewart, Allan F. Black, Chambers, Holland, Dudgeon & Hastings,* and *John C. McElhaney,* for appellants.

*Miles N. Lee,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The plaintiff, Lee Hagler, filed a petition in the Nebraska Workmen's Compensation Court against the defendants Thorval Jensen and Stanley Jensen, doing business as Arnold Livestock Commission Company, a partnership, and Iowa Home Mutual Casualty Company, an insurance corporation, for alleged injuries received by the plaintiff while in the employ of the defendants Jensen doing business as the Arnold Livestock Commission Company. The case was tried before one of the judges of the Nebraska Workmen's Compensation Court who entered an order of dismissal of the plaintiff's action. The plaintiff waived rehearing before the entire compensation court and appealed directly to the district court for Custer County. The trial court made the following findings: That on January 13, 1960, plaintiff sustained personal injuries in an accident while working for Thorval Jensen and Stanley Jensen doing business as Arnold Livestock Commission Company, in Custer County, Nebraska; that the plaintiff received said injuries within the course and scope of his employment by said defendants, and as a result thereof plaintiff suffered total and permanent disability for which he was entitled to compensation from the defendants; that

the plaintiff was entitled to recover for total disability the sum of $23.32 for 300 weeks beginning March 6, 1960, and $17 a week thereafter for the remainder of his life; that in addition the plaintiff was entitled to recover from the defendants the sum of $242.05 for medical, drug, and travel expenses in connection with his injuries, with credit of $320 to be given defendants for payments made; that the plaintiff, at the time of receiving his injuries, was being paid $1 an hour, which averaged $35 a week for the 6 months immediately preceding the accident; that 80 weeks had elapsed since the plaintiff quit work on March 5, 1960, which was the date total disability commenced; that there was due from defendants to plaintiff the sum of $1,865.60 (being 80 weeks at $23.32 a week) together with medical, travel, and drug expenses of $242.05, making a total of $2,107.65, less $320 for which defendants should be given credit, making a net sum due plaintiff from defendants of $1,787.65; and that thereafter plaintiff should receive from defendants the sum of $23.32 a week for the remaining 220 weeks commencing September 23, 1961, together with $17 a week thereafter for the remainder of the plaintiff's life. Judgment was rendered in accordance with the findings.

The defendants filed a motion for new trial which was overruled. Defendants perfected appeal to this court.

The petition filed by the plaintiff in the Nebraska Workmen's Compensation Court alleged in substance that on January 13, 1960, the plaintiff sustained personal injuries in an accident arising out of and in the course of his employment by defendants Jensen, doing business as Arnold Livestock Commission Company, which accident occurred at defendants' saleyard in Arnold, Custer County, for which injuries plaintiff was entitled to compensation from the defendants; that at the time of the accident the plaintiff was employed as a yardman and was receiving wages from the defend-

ants Jensen of approximately $35 a week; that the extent and character of the injuries sustained by the plaintiff was total and permanent disability; and that the defendants did pay workmen's compensation for 16 weeks, but stopped such payments and refused to pay any further amount.

The defendants' answer admitted that on or about January 13, 1960, the plaintiff was involved in an accident while in the employ of the defendant commission company, from which he sustained total and permanent disability and for which he was paid workmen's compensation payments for a period of 16 weeks at the rate of $20 a week; denied that the plaintiff was then disabled as a result of an accident arising out of and in the course of his employment; and denied that the plaintiff suffered from any disability other than such disability as he might have from an arteriosclerotic heart disease which had been present for some period of time predating the accident of January 13, 1960.

The plaintiff filed his petition on appeal in the district court, alleging in substance the same facts as were alleged in his petition in the Nebraska Workmen's Compensation Court.

The defendants' answer on appeal is substantially the same as the answer filed in the Nebraska Workmen's Compensation Court.

For convenience we will refer to Lee Hagler as claimant, and to the defendants Thorval Jensen and Stanley Jensen, doing business as Arnold Livestock Commission Company, a partnership, as defendants, and there is no occasion to mention the Iowa Home Mutual Casualty Company, an insurance corporation, which was the insurance carrier for the defendants heretofore mentioned.

The defendants' pertinent assignment of error is that the judgment of the trial court is not sustained by the evidence and is contrary to law.

We deem the following authorities to be pertinent to a determination of this appeal.

Section 48-151, R. R. S. 1943, provides in part: "The word accident as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." See, also, Tilghman v. Mills, 169 Neb. 665, 100 N. W. 2d 739.

In an action under the Workmen's Compensation Act the burden is on the claimant to establish by a preponderance of the evidence that he sustained a personal injury by an accident arising out of and in the course of his employment. See, Pittinger v. Safeway Stores, Inc., 166 Neb. 858, 91 N. W. 2d 31; Tilghman v. Mills, *supra*.

Such facts must be proved by the claimant by sufficient evidence leading to the direct conclusion, or by a legitimate legal inference therefrom, that such an accidental injury occurred and caused the disability. There must be shown a causal connection between an accident suffered by the claimant and the cause of his disability. Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51; Rose v City of Fairmont, 140 Neb. 550, 300 N. W. 574; Pixa v. Grainger Bros. Co., 143 Neb. 922, 12 N. W. 2d 74; Tilghman v. Mills, *supra*.

Symptoms of pain and anguish such as weakness or expressions of pain clearly involuntary or any other symptoms indicating a deleterious change in bodily condition may constitute objective symptoms within the requirements of the Workmen's Compensation Act. Knudsen v. McNeely, 159 Neb. 227, 66 N. W. 2d 412; Tilghman v. Mills, *supra*.

It is sufficient to show that the injury and preexisting disease combined to produce disability, and it is not necessary to prove that the injury accelerated or aggravated the disease, in order to satisfy the requirement of the statute that the disability arose out of the employment. Skelly Oil Co. v. Gaugenbaugh, 119 Neb. 698,

230 N. W. 688; Sporcic v. Swift & Co., 149 Neb. 246, 30 N. W. 2d 891; Tilghman v. Mills, *supra*.

On an appeal to this court in a workmen's compensation case the cause will be considered de novo upon the record before us. Anderson v. Cowger, *supra;* Tilghman v. Mills, *supra*.

With the foregoing authorities in mind, we come to a summary of the evidence.

The claimant testified that he worked for the defendants Jensen for 3 years; that he was 58 years of age at the time of the accident; that he worked as a clean-up man in the defendants' commission yards; that his duties were to pen up cattle and hogs on sales days, clean up the yard, and do the haying and feeding of the livestock on sales days; that he would pick up bales of hay and put them over a fence 5 or 6 feet high into feed racks; and that these bales of hay would weigh from 40 to 110 pounds. He further testified that the accident occurred in the hog yard at about 11 a.m., on January 13, 1960; that at the time of the accident he was engaged in helping to pen up hogs; that a hog ran down the alley, and the claimant grabbed a scoop shovel and ran after the hog to head it off; and that there was ice on the alley, the claimant's feet went out from under him, and the scoop shovel came down and hit him on the left leg above the ankle. The claimant further testified that his leg hurt so badly that he took his hand and rubbed it to ascertain whether or not he had broken it; that a big lump appeared on his leg in just a short time; that his leg hurt, but he did not do anything about it at that time; and that his leg began to get red, and he went home early. As time went on his leg became redder, and it seemed as though there were a lot of lumps which would go up his leg a little bit farther each day until his leg got to hurting him so badly that he went to the hospital to see Dr. Chaloupka on March 5, 1960. The claimant further testified that he tried to work, but could not do as much work as he had done; that from

January 13, 1960, his leg pained him all the time, and as soon as he got home he would lie on the bed and keep his leg elevated, which afforded him some relief; that he was unable to sleep nights and would get up two or three times in the night, walk around, sit down for a while, and then go back to bed; that when he went to see Dr. Chaloupka on March 5, 1960, the doctor informed him there was no room in the hospital where he could be taken care of, and told him to return home; and that the same night the claimant's back started to hurt him, he called the doctor, and the doctor told him to come back to the hospital which the claimant did the next morning, March 6, 1960. While the claimant was in the hospital he was ordered to remain in bed and not get up to go to the bathroom. The doctor ordered hot packs applied to the claimant's leg. While he was in the hospital he felt all right, otherwise than that his leg pained him to the extent that he could not stand on it. After he left the hospital and had been home 2 or 3 days, he got short of breath and developed chest pains which hurt him. He went back to see the doctor, and the doctor told the claimant to walk around a little bit, but that did not seem to help him and his chest pains kept hurting him. The pain in his chest continued all the time and hurt him at the time of trial. When he tried to walk the pains in his chest hurt him, and his leg hurt so badly that he was unable to walk very far or do any work. Before the accident he had no trouble with his legs, nor any aches or pains, and was able to carry on his work. The claimant further testified that since the accident he had been unable to do any substantial amount of work; that he tried to work but was unable to do so; that he had worked all of his life at hard physical labor; that his education was limited to the sixth grade; and that he was a farmer, lived on a farm, and rented his land. The claimant further testified that before the accident he was in good physical condition and had done his work all of the time; that if he had varicose veins

before the accident they never troubled him; and that his average wages amounted to $36.77 a week, based on $1 an hour.

On cross-examination the claimant testified that the wooden part of the scoop shovel hit his shin on the left leg; that it did not break the skin; that there was a concrete floor where the accident happened; that he was hospitalized on March 6, 1960, and remained in the hospital 9 days; that Cecil Lewis was present when the accident happened; and that after the accident his granddaughter took care of all the chores at his home.

Cecil Lewis testified that he worked at the defendants' commission yards and was working there on January 13, 1960; that he had known the claimant since 1928; that he would see the claimant several times a week; that he was the yard foreman and it was his duty to see how things were coming along in the yards; that during the week it was the claimant's duty to feed the cattle; that sometimes there were 100 head of cattle in the yard, and the claimant was to keep the livestock penned up and would come to this witness to see about feeding the livestock; that this witness worked along with the claimant; that the baled hay was piled up on the outside of the lots and had to be put into feed racks; that the bales had to be lifted 5 feet because the fence was 4 to 5 feet in height; that the bales of hay would weigh from 40 to 100 pounds; that before the accident the claimant would do everything that had to be done right along with anybody; and that claimant's health was good and he never complained, but was able to do a full day's work. This witness further testified that when he went to work the morning of January 13, 1960, the claimant was in the hog alley; that there was a small amount of snow which had melted and caused ice to form; that the claimant was trying to get the snow and ice away from the gates; that while the claimant was doing this, this witness unloaded a sow which weighed from 400 to 450 pounds; that the sow started to run by

the claimant who had a scoop shovel in his hand and the claimant was trying to herd the sow into the pen when he slipped and fell; that the sow hit the claimant or he slipped and fell down; and that the sow was between this witness and the claimant, and this witness could not see just how the scoop shovel lit. This witness further testified that the claimant said that his leg hurt, and he kept complaining about it all day; that the claimant had a lump on his shin which was sort of red in color; and that the claimant usually stayed at night until everything was loaded, but when he was halfway through his work on the day of the accident he asked permission to go home, which was granted. This witness further testified that the claimant worked between January 13, 1960, and March 5, 1960, but this witness did a lot of work that the claimant had done prior to the accident; that the claimant limped quite a bit, and when he was not walking he would stand so as to relieve the leg of its weight as much as he could; and that the longer the claimant worked during the day the more of a limp he would develop. When this witness saw the claimant after he left the hospital he would either be lying down or sitting on a couch with his leg elevated on a chair. This witness never saw the claimant do any work after he got out of the hospital.

LeRoy Christensen testified as to the heavy work performed by the claimant before the accident, such as lifting the bales of hay weighing from 80 to 100 pounds; that the claimant worked from early morning until late at night; that this witness worked along beside the claimant on sales days and never heard the claimant complain or saw him limp before the accident; that after the accident the claimant acted as if he was not able to work and this witness would help the claimant get the work done; that the claimant walked with a limp; and that the evening after the accident this witness saw a red lump on the claimant's leg where it had been hit.

Alvina Lewis testified that she was a cook at the

commission company owned by the defendants Jensen; and that she saw the claimant after the accident when he came in for lunch around noon. She asked the claimant about the accident, and he pulled up his pants leg and showed her his leg. She testified: "* * * his leg was swelled up, oh, I would say about like a hen egg, something like that, and it was red," and that it hurt him. After the accident she went to see the claimant a couple of times between January 13, 1960, and March 6, 1960, and the claimant was sitting with his leg elevated upon a chair. She could tell by the expression on the claimant's face that his leg was hurting him.

A sister-in-law of the claimant, who was a practical nurse, testified that she saw the claimant's leg a day or two after the accident and it was swollen and red, and there was a bump on his leg where he had been hit; and that after the accident the claimant's leg got worse all the time, and was swollen and turning blue. This witness described a cluster of several lumps, some larger than others, hard and inflamed, on the claimant's leg. She testified that before the claimant went to the hospital it was difficult for him to walk at all; that her husband took the claimant to the hospital to see Dr. Chaloupka, and that at that time the claimant was exhibiting terrible pain, holding his propped-up leg, and almost groaning with pain; that after the claimant came home from the hospital he still looked bad and would always put his leg up on a chair or lie down on a couch with his leg elevated; and that the claimant told this witness that he was getting short of breath.

The claimant's brother testified that he took the claimant to the hospital because his leg was hurting him and it looked bad. After the claimant returned from the hospital he was not able to do anything, he limped, and was short of breath. He was unable to walk, and would have to sit down. This witness saw the claimant occasionally during the summer of 1961, and the claimant was walking with a limp and was unable to do anything.

The claimant's daughter testified that she was at home a week before her father went to the hospital; that his leg was swollen, "puffy," and red; and that she felt along the vein and could feel the lumps that felt like beans in a pod, or like something running up the vein.

The claimant's wife testified that on the day of the accident the claimant came home early. His leg was swollen, feverish, and very red, and it became progressively worse. The clots kept forming in the vein above the bump until it was almost a solid vein at the time he went to the hospital, and every day he did less and less work. About the third day the lumps started to appear. The claimant followed the doctor's orders and kept off of his leg. The third or fourth day after he returned from the hospital he commenced complaining about his chest hurting. The doctor said that he had better move around a little, but that did not help matters any. The claimant could not work over 15 minutes at a time, and he worked very slowly.

This record discloses the testimony of five doctors who took the claimant's history, made laboratory tests, and took X-rays and electrocardiograms. To detail the evidence of these doctors would unnecessarily lengthen this opinion, but this evidence has been reviewed carefully, and we deem it only necessary to set forth the diagnosis and the opinions of the separate doctors relating to the disability of the claimant.

Dr. Melville Louis Chaloupka testified that he was engaged in the general practice of medicine at Callaway, Nebraska, and had been the family physician of the claimant since 1958; that he attended the claimant on August 12, 1958, when the claimant had hit his left wrist with a hand ax and cut three tendons which were sutured and from which the claimant recovered uneventfully; that on September 29, 1958, the claimant had an acute bursitis of his right shoulder; that in April 1959, he saw the claimant for a cerebral spasm of one of his cerebral arteries from which he recovered un-

eventfully; that the claimant usually recovered quickly with treatment; and that in August 1959, he saw the claimant for an acute prostate infection from which the claimant made a full recovery and returned to his usual work. On March 5, 1960, the claimant walked into this doctor's office with a decided limp. The claimant was a well-developed white male. The claimant had varicose veins which were nonsymptomatic. An examination revealed an acute thrombophlebitis of the left leg involving the superficial and deep veins. This doctor testified, with reasonable medical certainty, that the most probable pathological cause of any phlebitis is trauma, a bruise, a bump, or some form of hurting the vein so that the lining of the vein becomes inflamed, forming a clot, with secondary infection, and that is what happened to the claimant. The doctor further testified that the claimant received an injury on January 13, 1960, which slowly and progressively became worse through the weeks that he did not see a doctor. The doctor further testified that the thrombus in the deep vein of the left leg when it first formed was not secured, and that many times little pieces will break off of the thrombus and flow with the blood stream through the veins to the heart and through the heart into the lungs, and usually stop and plug a vessel in the lungs. If the emboli are large enough, the pain and shock usually kills the patient. If the emboli are small showers, usually they damage the lung vessels so that there is a compensatory increased pressure in the pulmonary blood system which causes dilatation of the heart and the resulting symptoms of heart failure. The symptoms are pain in the chest and shortness of breath. The claimant had a shortness of breath, pain, and swelling of the ankles. The doctor testified that the accident or trauma the claimant suffered in January was the originating cause of the emboli, causing the superficial and deep thrombophlebitis. The doctor further testified that the claimant was very definitely disabled from doing

any type of strenuous labor. He was unable to work at the saleyard, and was unable to carry on any gainful occupation which required the use of his arms, his legs, and his body. The doctor's opinion was that the claimant's disability was permanent, that he would not get any better, and that he was totally and permanently disabled as a result of the accident. This doctor further testified that he found no arteriosclerosis of the general circulatory system, and no arteriosclerotic heart disease; and that, based on reasonable medical certainty, there was a direct causal connection between the accident of January 13, 1960, and the condition of the claimant at the time of trial.

Dr. William Nutzman testified that within reasonable medical certainty the claimant's condition on April 19, 1960, showed that undoubtedly the claimant experienced a traumatic episode to the lower portion of his left leg which resulted in damage of venous structures in the area to the extent that thrombosis formed in the superficial veins of the left leg and probably the deep venous structures of the left leg became secondarily involved, and subsequent to such event claimant experienced emboli from this area which lodged in his lungs; and that with reasonable medical certainty on March 29, 1960, the claimant was experiencing an acute episode consisting of showers of small emboli lodging in the lung fields, resulting in an acute dilatation of his heart and pulmonary vessels. Emboli more than likely originated from the deep venous structures of the left leg. The claimant experienced a traumatic episode which resulted in damage to superficial venous structures and consequently these structures exhibited thrombosis, and subsequently the deep venous structures became involved. This situation was caused by a thrombophlebitis occurring prior to April 19, 1960. History of the claimant indicated the thrombophlebitis process occurred sometime between the traumatic incident on January 13, 1960, and April 19, 1960. With reasonable

medical certainty, the doctor's impression was that the claimant was not disabled in any way prior to January 1960. His history indicated that he was an able-bodied man before the accident. After securing the history, it was this doctor's impression that the claimant had not been able to pursue his usual occupation from the time of the accident until he saw him on April 19, 1960. When this doctor saw the claimant, he was not able to work. The doctor further testified that on April 19, 1960, the claimant's physical examination did not reveal evidence of arteriosclerotic heart disease.

Dr. Robert C. Rosenlof testified that his practice was limited to internal medicine and diagnosis. His diagnosis, with reasonable medical certainty, was that on the basis of the history, physical findings, and laboratory and X-ray studies, the claimant had pulmonary hypertension with cardiac dilatation when he saw the claimant on May 31, 1961. At that time the claimant had pulmonary hypertension and enlargement of the heart with dilatation of the pulmonary artery. The heart enlargement and dilatation of the pulmonary artery were secondary to repeated pulmonary emboli arising from the deep vein thrombophlebitis of the left lower extremity. The doctor further testified that, with reasonable medical certainty, the thrombophlebitis resulted in a thrombus or thrombi of the lower left extremity. The most usual cause of thrombophlebitis, or the clot forming in the vein, is injury, any sort of trauma. The most important cause of thrombosis is injury to the lining of the vessels. On the basis of reasonable medical certainty, the doctor testified that the injury played an important aspect in the claimant's case, and there was definite causal connection between the injury and the disability that the claimant had at the time of the examination. When the doctor examined the claimant, the claimant was not capable of doing what he had previously done prior to January 1960. He could not go

back to work as a handyman at the salesyard and do strenuous work.

On cross-examination Dr. Rosenlof testified that his opinion was that the injury to the claimant's left ankle ultimately affected his heart; that he did not think it was unusual that the first evidence of heart symptoms appeared 2 months after the accident; and that within 24 hours after the accident the left leg was swollen and the claimant noticed lumps along the medial and anterior aspects of the left leg. On May 31, 1960, the claimant was complaining of shortness of breath on exertion. There was no direct evidence of arteriosclerotic heart disease. This doctor testified that a slight stroke on May 13, 1959, would have no bearing on the claimant's condition at the time of the examination. The shower of emboli affected the lungs and the heart, and that came from a thrombus of the left leg.

Dr. D. A. McGee, a physician and surgeon, testified on behalf of the defendants. He gave as his opinion that the claimant probably had emboli from a clot; that from his history this could have occurred in 1959 at the time he had a stroke; that it is an established and accepted fact that emboli are not broken off from the thrombus or clot 72 hours after their formation; that it is also an established fact that the throwing off of the emboli when a patient is suffering from a thrombophlebitis is in the realm of a rarity; that the claimant must have had heart failure with his impaired circulation; and that he was treated for it and was still taking medicine to prevent this condition recurring. Dr. McGee's final conclusion was that there was no factual or physical correlating of this claimant's history and the findings at the time of the examination, which was on August 30, 1961, to the claimant's present complaints, nor to his described accident of January 1960. The doctor's conclusions and opinion were that none of the claimant's present disability was caused by the shovel-handle accident as described in his history given to the doctor.

Dr. John C. Thompson, who confines his practice to internal medicine and diagnosis, testified on behalf of the defendants that so far as the story of the thrombophlebitis, it is noted by the claimant's history that this condition dates back to January 1960, when the lump appeared, and he went to see a doctor on March 5, 1960; that the most that could have happened as a result of the bruise on the claimant's leg to a previously existent vein which was dilated would be a bruising, and this happens often with people who have varicose veins; and that one may get a little clotting of blood in this vein which is sometimes painful and lasts only a few days as a general rule. The doctor's opinion was that there was no connection between the lump which occurred in the claimant's left leg in January 1960 and the thrombophlebitis which occurred in March 1960, and there was no relationship between the claimant's injury and the things that happened subsequently. The doctor did not believe there was any connection between the claimant's injury and his complaints during the examination that this doctor made of the claimant on July 25, 1960. The doctor testified that there was a swelling of the claimant's leg which follows thrombophlebitis, but the claimant was not wearing an elastic stocking which would relieve this condition and permit him to work. The doctor's opinion was that the claimant was perfectly able to work on the basis of anything which could have occurred as a result of the accident; that the accident was a temporary, little injury that occurred to the claimant's leg, which had no connection with the subsequent events which occurred sometime later; and that the claimant's cardiogram showed his heart to be normal.

The following rules apply in the instant case.

"* * * where the evidence is conflicting and cannot be reconciled, this court will consider the fact that the district court that tried the cause de novo and observed the demeanor of witnesses gave credence to the testimony of some rather than to the contradictory testimony

of others." Knaggs v. City of Lexington, 171 Neb. 135, 105 N. W. 2d 727.

"For workmen's compensation purposes, 'total disability' does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do." Tilghman v. Mills, *supra*. See, also, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262; Elliott v. Gooch Feed Mill Co., 147 Neb. 612, 24 N. W. 2d 561.

The record discloses that the claimant was an unskilled, common laborer. If he can work at all, it would have to be the lightest kind of common labor. The evidence demonstrates that the claimant is unable to earn wages in the same kind of work, or work of a similar nature, that he was trained for or accustomed to perform.

From a review of the evidence and the authorities herein cited, we conclude that the judgment of the trial court should be affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.