MARIE LEE, APPELLANT, V. LINCOLN CLEANING & DYE
WORKS ET AL., APPELLEES.

15 N. W. 2d 330

FILED JULY 28, 1944. No. 31755.

*Frederick J. Patz,* for appellant.

*Baylor, TouVelle & Healey, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

This is a workmen's compensation case, in which plaintiff seeks an award for disability arising out of an accidental injury sustained by her in the course of her employment with the defendant company on August 11, 1942. A judge of the compensation court awarded her $14.67 a week for not to exceed 300 weeks, with medical expenses. Defendants appealed to the district court, and the award was set aside. Plaintiff appeals to this court.

The defendants in their petition on appeal in the district court deny that plaintiff had any accident or injury which was compensable within the meaning of the Nebraska workmen's compensation act, and charge that the award entered in the compensation court by a judge thereof is not supported by the evidence, is contrary to law, and should be set aside and vacated; that the judge erred in finding that the plaintiff suffered any permanent disability, and in finding that the disability suffered was in excess of a period of two weeks; that if plaintiff suffers from any disability of any character, which is not admitted but is expressly denied, the same is the result of sickness and infection, or an inherent condition within the plaintiff, or other natural causes, and is in no way related to or connected with the alleged accident.

The plaintiff filed answer to the defendant's petition on appeal, alleging that she sustained an accidental injury in the course of her employment while ironing a garment, and received a severe and painful electric shock from an electric iron, transmitted from the iron to the fingers of her right hand and her right arm, shoulder and body; that as a result of said electric shock the plaintiff's fingers of her right hand and her right hand, arm, right shoulder and right side were and have been permanently totally disabled, and there exists therein weakness and pain to such an extent that she is unable to carry on any of the duties for which she was employed at the time of the accident, or to do any kind of work for remuneration or gain, and that plaintiff has lost the permanent total use of the fingers of her right hand and of her right hand, arm and right side of her shoulder, and that since August 21, 1942, she has been under the constant care of her physician.

Plaintiff further alleges that she has no special training or education whereby she can earn a living without the use of the fingers of her right hand, right hand, arm, and right side of her shoulder; that she is by education and training a silk finisher, and is entitled to full compensation benefits as provided by law; that she has incurred doctor bills in the sum of $433, and bills for medicine in the sum of $5.40, and that she will incur further doctor and medical bills in the future by reason of said accident, injury and disability resulting therefrom; that at the trial before Honorable Charles E. Jackman the plaintiff was awarded $14.67 each week from and after August 21, 1942, for temporary total disability for a period not to exceed 300 weeks, and plaintiff alleges that she should have been awarded 50 per cent penalty for waiting time and a reasonable attorney's fee.

Plaintiff further alleges that she has not performed any work for pay or gain since August 21, 1942, and is unable to perform any work for pay or gain because of the injuries as set out; denies that said disability arose from a condition inherent within the plaintiff, and alleges that her physical condition has become progressively worse since the

time of the accident, and that the award of the compensation court is supported by the evidence and by the law.

After trial in the district court *de novo*, a judgment was entered by the district judge, finding that the plaintiff suffered only trivial injury because of the accident of August 11, 1942, which did not result in any disability beyond a.period of seven days after the date of the accident, and that plaintiff has not since the time of the accident suffered any compensable disability, and that if she suffered any disability the same arose from a condition inherent in herself which is not connected with the alleged accident of August 11, 1942; that the award of a judge of the compensation court should be reversed, vacated and set aside and held for naught, from which judgment the plaintiff filed a motion for a new trial.

Ten errors are relied upon for reversal by the plaintiff, which may be summarized as follows:

That the trial court erred in finding that plaintiff did not sustain an injury from the accident she suffered, and in setting aside the award entered in the compensation court in favor of the plaintiff, and in dismissing the action;

That the district court erred in refusing and failing to find that the plaintiff had proved by evidence leading either to the direct conclusion or to a legitimate, inference that the plaintiff was entitled to be paid for all medical expense, including doctor bills;

That the district court erred in finding that the disability of the plaintiff "arose from a condition inherent in herself which condition was not and is not, connected with the alleged accident;"

That the district court erred in failing and refusing to find that the injury suffered and sustained by the plaintiff aggravated a pre-existing diseased condition of the plaintiff, causing hysteria, neurosis, and disability;

That the district court erred in failing and refusing to follow the long-established rule of our supreme court and the statutes of the state of Nebraska which provide for a liberal interpretation of the evidence in compensation cases;

That the district court erred in failing and refusing to permit the plaintiff to amend her answer to defendants' petition on appeal after judgment had been entered and before the motion for new trial had been ruled upon, and such failure and refusal on the part of the district court was an abuse of discretion;

That the judgment of the district court is not sustained or supported by the evidence.

The plaintiff, Mrs. Marie Lee, testified that she was 41 years old in July, 1942, and had been married about 23 years, and has one son 20 years of age. Her husband is a common laborer, employed at the Stuart building, and they had lived in Lincoln about two years before the time of the accident, moving here from Fremont. She worked at the Paramount Laundry & Cleaners for about a year, and then at Butler's Cleaners before she began working for defendant.

She had an operation for appendicitis when she was 19 years of age, and about four years before the accident Dr. Condon of Omaha operated for a tumor and removed her uterus and ovaries, and within four months of that operation she went to work in a cleaning plant in Fremont as a silk finisher and presser; after garments were cleaned she would measure them so that they would be the proper size when finished.

She testified that at the time of the accident she was working with an electric steam iron which has holes at the bottom of it to let the steam out when you put your foot on the pedal, and has a cord which plugs in for electricity, and you stand on a rubber mat and work at the wooden ironing board; there is a wooden handle in the center, with a metal piece which comes up on both sides to hold the wooden handle on, and on this iron you were required to touch the metal.

On August 11, 1942, after a half-hour lunch period she returned to work, and was to teach a girl how to finish silk, and she started in by measuring the garment, and showed her how to take hold of the iron, and this girl had wet feet

and got a shock, and she told the girl that she could not iron if she had wet feet, and plaintiff started in and just as she put her foot on the pedal, and had her iron in her hand, she received a shock, which went in her right hand, arm and shoulder and through her back. She made some kind of an outcry, and got to a couch nearby in the washroom. She laid down, as everything was getting black. She thinks she became unconscious, and the others helped her, rubbed her arm, and put cold water on her face, and the next time she looked at her watch, which they had taken off to rub her arm, it was around 2 o'clock.

Mabel Mercier was a fellow employee who helped her, and also another girl, Louise, the seamstress. The office manager was Freda Hansen, who acted as boss when Mr. Truman was not there, and gave instructions to the girls. At the time of this accident Mr. Truman was not at the plant. Miss Hansen asked if she was all right, and she said her arm was numb, and Miss Hansen told her to come out in front and get some air, and so she sat out on the sidewalk about half an hour, and then she tried to work again, and used a tape measure to get the width and length of garments, but it was painful for her. When Mr. Truman came back she told him exactly what had happened, and about the shock she had received, and he said, "Well, we will see how it is tomorrow and then we will make arrangements that you go to the doctor." She said they had already taken that iron away.

She came back to work the next day, but did not try to do any ironing, but measured the garments and complained to Mr. Truman about the pain from the accident, and he told her to go and see a doctor, and gave her the address. The doctor looked at her hand and arm and shoulder and said he thought she would be all right, and said to just keep on working and using her hand and arm. There was some discoloration at that time in the palm of her hand, and ten days after the accident the same doctor came to the cleaning works to see her, and she complained of the pain and he told her, "What I can do is to give you some dope or cut

your arm off." This statement of the doctor frightened her terribly. She immediately left the office and went out in the plant and made an appointment to see her own doctor, and went to his office about 3 o'clock that same afternoon; he gave her a thorough examination for about two hours, and told her she should rest the arm, hand and shoulder and go back and tell her employer that she was unable to work for a while.

She asked her doctor whether she had to have her arm taken off. He replied, "Why, no, * * * what makes you think that?" She said the company doctor told her she had to have her arm taken off and that she believed him. She went back and told Mr. Truman, the owner and manager, that her doctor told her she would have to rest her arm for a while, so he could get somebody else to take her place. Mr. Truman said "he didn't like that because he needed me awful bad and Saturday was a busy day," and she told him that it was no fault of hers, it was the doctor's orders, and furthermore that she was not getting any better, and said she had told him during the ten days she worked that her condition was not improving.

She quit work on August 21, 1942, and has never been back a day since, and has never worked anywhere else since then, and is only able to do a very little of her housework. She testified that for months she went to see her doctor at his office every day except Sunday, and has constantly been under his care, and her arm and hand have been getting worse right along; that she has terrible pains when she tries to hold or lift anything, and that severe pains go across her neck and side and back to her shoulder, the pain starting in the middle of her right hand; that she has severe headaches, and some nights is unable to sleep, whereas before the accident she had perfect health.

She testified that she has been working in cleaning establishments for 12 years; that that is the only kind of work that she is fitted for, having only an eighth grade education, and is unable to do stenographic work or office work; that she has little or no appetite, is very nervous, fussy and irri-

table, cannot stand the radio, which she enjoyed before the accident and listened to programs every evening; that her hand hurts her, she has to give it support and hold it up with her other hand; that she was right-handed; that when she walks it jars her hand, and if she hangs it down it hurts her and she has to hold it up; that she can do some of the cooking at home with her left hand, that she can wash the dishes but cannot wipe them; that she is unable to get any kind of employment by reason of the accident, and has lost the use of her right arm; that she has incurred doctor bills, and the defendant company has not paid her a cent of compensation, or doctor bills, or medicine bills.

Mabel Mercier testified that she lives at 1500 Vine street, and was working at the ironing board right in front of Mrs. Lee at the time Mrs. Lee had her accident; that she was also a silk finisher, the same as Mrs. Lee; that she "heard her holler 'Oh'" and turned around; that Mrs. Lee had jumped back toward the sweater board and tried to place her iron, and witness tried to catch her, and asked her what was the matter, and she said she got a shock and everything went black; that she went to the rest room "kind of wobbly," and she helped her lift her feet up on the couch, took off her wrist watch and started rubbing her hand; that she received this shock about 25 minutes to 1 o'clock; that the witness and another girl, named Louise Ellithorpe, worked with her about 30 minutes, and Mrs. Lee stayed there some time after that and finally went to the front door and one of the boys put a chair for her to sit on where she could get fresh air; that one of the boys disconnected the electric iron that Mrs. Lee was using, to take it to an electric shop; that she worked there some time afterwards, and that they did not put that same iron back in use during the time she was there, that they had another iron.

The witness testified that Mrs. Lee worked there a few days afterwards, complained of her hand being stiff, that she could not use it to measure or to lift the iron; that she tried to use the iron, but her fingers were stiff and she could not use the iron at all after the accident. The wit-

ness said that she doubted if Mrs. Lee would ever be able to use an iron the way it had to be handled to do the work.

On cross-examination she said that Mrs. Lee got to the rest room ahead of her, and was sitting there with her hand over her eyes. "I asked, 'What's the matter' and she said she got a shock, * * * she was kind of hazy and we laid her down and I took her wrist watch off and got one of the girls to come in with a rag to wipe her face and keep damp cloths on her face." She seemed conscious but rested there for about an hour and then went out and sat in a chair. During the ten days that Mrs. Lee worked there after the accident, she said that she did not do the same work, but she measured garments, and tried to write measurements, but said it hurt her when she moved her fingers. She worked at the body machine, where skirts are ironed, and used her left hand mostly, and when she took hold with her right hand it pained her quite a bit.

Mrs. Jacobs, a neighbor whom plaintiff knew very well, testified that her hand and arm were all right before the accident, and that she would not be able to get any employment in her present condition.

Plaintiff's husband testified that he worked nights as janitor for the Stuart Investment Company; that before this accident plaintiff was pretty healthy, always happy and singing, but that now she is nervous, complains, and is "pretty crabby" and hard to get along with.

We now come to the testimony of the plaintiff's physician. It is given in the greatest detail, and covers nearly 50 pages of the bill of exceptions.

He set out the history of the case as she gave it to him when he first took over the treatment. He gave her a careful examination, and found her eyes, teeth, breast, heart, lungs, and blood normal in every respect. The Wassermann test was negative. X-rays showed no breaks or dislocation of the bony tissue, and his diagnosis is a traumatic neuritis of the nerves of the right lower arm and hand.

Exhibit No. 1, consisting of four pages, is an itemized statement of the kind of treatments given her when she

called at his office daily except Sundays, beginning August 21, 1942, and continuing up to the time of trial in the district court.

These treatments have prevented the atrophy of the muscles, and usually there were 30 minutes' exposure to infrared, the next 30 minutes long wave diathermy, other times short wave, in which the hand is placed in a salt solution and the current goes in one direction and then the other. Following the last 30 minutes there will be a massage to all of the muscles, varying in depth and strength to keep up the blood supply. If the massage is too strong it increases the irritation in the nerves; it must be just right. When necessary, on a number of occasions he gave her cobra venom.

"Q. As a result of this shock I think you stated your diagnosis was traumatic neurosis, is that right? A. The exact diagnosis is traumatic neuritis in the right arm and a post-traumatic neurosis. Q. Will you explain to the court traumatic neuritis and then traumatic neurosis? A. Traumatic neuritis is inflammation of the nerves due to an injury. Post-traumatic neurosis is a mental state entering into an injury and continuing beyond the average time following an injury. After every injury every person has post-traumatic neurosis and that is one of the things they must get over, and they normally get over it. * * * Q. Would these treatments need to be given with the same frequency in the future as they have been given in the past? A. That would vary. Try to lengthen out the time between treatments, and if the muscles don't soften, that is all right; but if the muscles begin to soften, then the treatments aren't given often enough."

He testified that the unfortunate statement made to her by the doctor for the insurance carrier, that he might have to remove her arm, tended to aggravate and help her develop a psychoneurosis, which many patients develop after electric shock; that her condition has been progressively worse as far as the inflammation of the nerves is concerned.

After having cared for her daily during all these months,

her doctor testified that he had prevented an atrophy of the muscles of the right arm, but had not increased its strength; that the contraction strength of the right arm at its greatest point was 30 kilos, while the left arm was 60 kilos; that the tenderness in the arm has varied from time to time; that its temperature is pretty cold most of the time; that the co-ordination of the fingers and the wrist are below normal; that the pain has gone upward into the upper arm and finally into the cervical plexus of the right side of the neck; that nervousness and headache have followed; that, while she can move her fingers, she does have a total loss of the use of the hand for doing any work, and that this is true of the forearm and, to a lesser degree, of the upper arm, and that she is totally disabled from doing the kind of work she was doing at the time of the accident, and that there is nothing to indicate when this total disability might cease.

The defendants, to meet this evidence, called only three witnesses, to wit, a lawyer and two medical experts.

Hymen Evnen testified that he was an attorney working with George Healey for the insurance carrier, and that the day before he testified they went out to plaintiff's place at 1820 South Fifty-second street twice, once about noon, and sat in the car and drove around her home. He saw her out at the chicken-yard, feeding the chickens from a pail in her left hand; that as she walked around she carried her right hand straight down along her side. Mr. Evnen testified that they drove back there about 3:00 p. m., and stayed around and saw her pick up an empty blue kettle in her right hand and swing it rather freely by the handle; that he observed her about 15 minutes; that at one time she was standing with her arms folded, but he is not certain whether the left arm was under the right or the left arm over the right.

A medical expert called by the insurance carrier saw the plaintiff on August 12, 1942, at his office in the Sharp building; he saw her the second time for a moment on August 21 at the cleaning establishment, and these were the only

times that he saw her professionally. He stated that the bluish discoloration, somewhere around an inch in size, which he found in the palm of her hand might have been due to the electric shock, or might have been due to a bruise, but anyway it was there, and when asked if he had not testified in the compensation court that in his opinion the bluish-greenish discoloration was due to an electric shock he answered, "I don't remember. It could have been." He testified that she had had an electric shock, but it was not a severe one. He said she complained of numbness in her hand, especially in the finger-tips, and that there was pain starting in her hand and going up into the right forearm. On cross-examination he was asked this question: "Q. You had no reason to disbelieve her? A. No, I didn't disbelieve her."

The other physician called as a medical expert by the defendants had examined the plaintiff twice, once on December 8, 1942, and again on March 9, 1943, and told of the complaints that she made. He testified that the operation for hysterectomy and oophorectomy was performed on the plaintiff when she was 38 years of age, and that operation produced artificial menopause at a time when the body was not prepared for it, and that such an operation at that time always results in an unstable nervous system. He testified that her physician had given her treatments since the accident which the patient did not need, and that all she needed was merely mental suggestive treatments.

He testified that the plaintiff was suffering from hysteria, partly pure exaggeration, and that it was either hysteria or malingering; that if she is not malingering she has hysteria due to an unstable nervous condition based on her menopause difficulty.

This case, as thus presented to this court, resolves itself into a question of fact. The plaintiff's physician, who has had her under months of observation and has given her daily treatments of various kinds for overcoming her muscular and nervous affliction, which has progressively grown worse, gives it as his positive opinion that the plaintiff's

condition came about from the electric shock, which no one denies she received, while at work in the cleaning establishment while using an iron which was immediately taken to be repaired.

The claim of the defendants that her present permanent disability is in no way the result of an electric shock, or affected thereby, and that she is either a malingerer or that her condition is brought about solely by an operation which took place some three years before the accident, from which she had completely recovered, and had worked steadily since that time and was earning $22 a week at the time of her accident, does not impress this court, and is not supported by the evidence.

"Ordinarily, the employer endeavors to show that the employee is a malingerer. The term is defined in *Great Western Sugar Co. v. Hewitt*, 127 Neb. 790, 257 N. W. 61, as follows:

" 'Malingering, as applied to compensation cases, may be defined as a deception, practiced by a dishonest employee, by feigning, inducing, or prolonging either sickness or injury, for the purpose of securing illegal or fraudulent payments therefor under the workmen's compensation law.'

"Applying the above definition to the facts and circumstances in the instant case, the evidence falls short of establishing with reasonable certainty that the appellant is a malingerer." *Rexroat v. State*, 142 Neb. 596, 615, 7 N. W. 2d 163.

The plaintiff has proved that she had an accident arising in the course of her employment, and that it resulted in a compensable injury. See Comp. St. Supp. 1941, sec. 48-152.

She may be allowed compensation for neurosis if it is a proximate result of her injury and results in disability (*Welchlin v. Fairmont Railway Motors*, 180 Minn. 411, 230 N. W. 897), and where she has been unable to perform any substantial amount of labor, either in her particular line of work or in any other for which she is fitted except for the injury following an accident, she is totally disabled within the meaning of the compensation law. See *Wingate v. Ev-*

*ans Model Laundry,* 123 Neb. 844, 244 N. W. 635; 98 A. L. R. 732, Annotation; *Micek v. Omaha Steel Works,* 136 Neb. 843, 287 N. W. 645.

In the instant case, defendants waived a hearing before the full bench of the compensation court, electing to appeal directly to the district court for a trial *de novo,* in accordance with section 48-174, Comp. St. Supp. 1941, which section provides that the judgment of the district court may be set aside only upon four grounds, the third ground being that the findings of fact are not conclusively supported by the evidence, and having so found, we have considered the case *de novo* upon the record.

The evidence in this case indicates that from August 21, 1942, to about April 17, 1943, which was a period of 34 weeks, the plaintiff was under the care of her doctor and received daily treatments at his office, and was unable to do any work for pay, and that during said period of 34 weeks she suffered a total disability, for which she would be entitled to 66 2/3 per cent of her wages of $22 a week, or an award of $14.67 for 34 weeks, which amounts to $498.78.

We further find from the evidence given at the trial that upon the termination of her total disability she was partially disabled for some time. It is true that claimant testified that she was totally disabled up to the time of trial. There is also expert testimony to the effect that she was permanently disabled. Claimant was, however, impeached to such an extent that her claim that she was totally and permanently disabled cannot be sustained. The evidence of the medical experts is so conflicting that it will not sustain a finding of permanent total disability. We think the evidence will sustain a finding of partial disability of 50 per cent for 75 weeks following total disabilty. In addition to the total disability awarded, claimant is therefore allowed 50 per cent of 66 2/3 per cent of her wages of $22 a week, the sum of $550. Claimant is allowed $468 for the payment of medical expenses.

The plaintiff asks to be allowed attorney's fees in this court. We have allowed attorney's fees many times where

the employer has appealed and failed to reduce the employee's award, as in *Perkins v. Young*, 133 Neb. 234, 274 N. W. 596.

Section 48-125, Comp. St. Supp. 1941, covers the allowance of attorney's fees in compensation cases. In *Rexroat v. State*, 143 Neb. 333, 9 N. W. 2d 305, the exact point in the instant case was contested, and it was held that, when the employee appeals from an adverse decision in the district court which denied an award of compensation, and this court reverses the district court, and holds that the employee is entitled to compensation, this court is not authorized to allow the employee an attorney's fee under the section of the statute just quoted, and therefore we grant no attorney's fee on this appeal. See *Updike Grain Co. v. Swanson*, 104 Neb. 661, 178 N. W. 618.

The judgment of the district court is set aside, and the cause is remanded with instructions to enter an award for plaintiff in accordance with this opinion.

REVERSED, WITH DIRECTIONS.