QUINCEOLA H. DAVIS, APPELLANT, V.
WESTERN ELECTRIC, APPELLEE.

317 N.W.2d 68

Filed March 12, 1982.   No. 44026.

Paul W. Deck of Deck & Deck for appellant.

James L. Quinlan of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

The plaintiff, Quinceola H. Davis, filed this action in the Nebraska Workmen's Compensation Court seeking an award of benefits for injuries which she sustained to both hands, wrists, and arms while performing duties as a machine operator in the defendant Western Electric's Omaha plant. A single-judge court determined that her injuries were compensable, but determined that the plaintiff had failed to prove any temporary or permanent disability and limited the award to the payment of bills for medical services. Following plaintiff's application, a rehearing before a three-judge panel was held, and the panel found that Mrs. Davis had failed to sustain her burden of proving that she was entitled to any disability compensation. Except for ordering payment of several minor medical bills, the award on rehearing affirmed the action of the one-judge court in denying disability benefits.

In the early part of January 1979 Mrs. Davis began operating a particular assembly machine in the course of her employment by Western Electric. This operation required repeated application of pressure with both hands between 800 and 1,200 times daily. While performing this function, she began to experience pain, swelling, and a tingling sensation in her wrists and hands. The record indicates that Mrs. Davis first reported this problem to Western Electric's medical department on January 23, 1979. She was treated with hot soaks, and was directed to return the next day for an appointment with the company physician. On January 24th she did return and was examined by a

company doctor who prescribed hot soaks at home and gave her a wristlet for her left wrist. She again came to the plant medical department on the 25th, complaining of pain in both wrists. Continued soaks were suggested, as well as the use of wristlets. She was also given a temporary medical restriction that she should only use her hands to tolerance.

Dr. Lee B. Grant, head of the Western Electric medical department, stated that the employee's supervisor is notified of such a medical restriction and is instructed not to allow the employee to do any task that aggravates the condition. The level of pain to be tolerated is up to the individual employee. On January 31st, following continued complaint, Mrs. Davis was placed on a temporary restriction of no use of the right hand. The restriction was returned to use of both hands to tolerance on February 7th. Her medical restriction was changed on February 13th to minimal use of hands and wrists, with no repetitive use of hands and wrists, and she was assigned to a sorting operation of some sort. Due to continued complaints, Mrs. Davis was moved to the "restriction room" or "convalescent room" where she would do file labeling which involved placing stickers on envelopes. She continued in this job until around the first of June.

About this time, the various physicians who had been seeing Mrs. Davis, both Dr. Grant, the company doctor, and Dr. David W. Minard, a personal physician and orthopedic surgeon of her choice, concluded that her hands were all healed up and they wanted her to take some psychological testing. She refused these tests and Dr. Minard released her, telling her there was nothing more that he could do, and Dr. Grant released her to go back to her original department. However, she was not placed on the assembly machine, but was given a job stamping dates on finished conductors with a rubber inked stamp. She complained that this caused her pain so she went to yet another doctor, Dr. William H. Johnson, who had treated her in 1975. On June 12th

Mrs. Davis called her supervisor and told him that her doctor had advised her to rest her hands and wrists and that she would not be in for work. He responded that if she failed to come in she would not be paid and would probably get fired. He also told her that if she would come in he would not make her work, but she could just sit there. Sometime around the 22nd of June she received a letter from Western Electric advising her that she was terminated.

The Western Electric medical file contains approximately 65 entries from the period January 23, 1979, to June 25, 1979. Some of these entries indicate a conference with one of the plaintiff's outside physicians, but for the most part they represent direct contacts — complaints and treatments — with Mrs. Davis.

The first outside physician who examined Mrs. Davis was Dr. Michael Morrison, an orthopedic surgeon. He did not testify, nor was his deposition taken, and therefore there is a great deal of conflict regarding his diagnosis and treatment. Following the first examination by Dr. Morrison on February 6, 1979, Mrs. Davis testified that the doctor put steel splints on her hands and wrists and advised "complete rest" for her hands, which she interpreted to mean performing no work at all. Dr. Grant, on the other hand, stated that he had spoken to Dr. Morrison and that the recommendations merely involved restricting Mrs. Davis' activities to work involving only "light gripping." It should be noted, however, that the medical file reveals that she was absent from work from February 6th until February 13th. There is a memo in the record dated February 28 from Dr. Morrison which states that Mrs. Davis had "flexor tenosynovitis both wrists" which may or may not have been caused by her job but which was aggravated by working the "punch press." It also contained the recommendation that Mrs. Davis "be allowed to continue with the present limitations." To interpret "present limitations," we must look at a letter dated February 16th from an associate of Dr. Morrison, Dr.

Richard P. Murphy, who had seen Mrs. Davis on February 16th. He determined that Mrs. Davis suffered from "synovitis in flexor tendons both wrists" and recommended "discontinuing active repetitive motions of the wrist, to immobilize the wrists in wrist splints and to return for follow-up evaluation in two weeks time." It was at or near this time that her employer placed Mrs. Davis under "minimal use of hands and wrists" and "no repetitive use of hands and wrists" limitation and moved her to the "detailing" or sorting job. It is apparent that Mrs. Davis returned in 2 weeks for further evaluation as reflected by Dr. Morrison's memo, but the record does not disclose that she ever consulted that office again.

Mrs. Davis elected to see yet a third doctor, Dr. David Minard, an orthopedic surgeon, who examined Mrs. Davis on five occasions, the first being March 12, 1979. After this initial visit Dr. Minard indicated in a letter to Western Electric that he concurred with Dr. Morrison's treatment but felt that nerve conduction studies should be performed. He also recommended that Mrs. Davis could continue to do work "which is feasible as long as she wears the wrist splints." Thereafter, Mrs. Davis was referred to Methodist Hospital where an EMG and nerve conduction studies were done, resulting in a finding that Mrs. Davis was "within the limits of normal." Following the fourth examination, Dr. Minard referred Mrs. Davis to Dr. Jerrad J. Hertzler, a neurologist, who found Mrs. Davis' performance during neurologic testing to be "bizarre," and concluded that no objective evidence of a neurologic deficit existed and that any deficits present were of a "nonorganic type." His recommendation was for further evaluation, including "psychiatric evaluation."

Dr. Minard's final visit took place on May 15, 1979, at which time he informed Mrs. Davis that she should see a clinical psychologist to take the Minnesota Multiphasic Personality Inventory evaluation. Dr. Minard stated she reacted in a "hostile" fashion to the sug-

gestion and refused to take the test. In Mrs. Davis' words, she felt "they was saying I was crazy, and I knew I wasn't going to no hospital and taking no shock treatments and no lobotomy tests and all that. So, I refused to go." Dr. Minard denied any suggestion was made regarding electric shock, drug therapy, or brain surgery, and in fact stated that he told Mrs. Davis that the test merely involved "answering some questions, multiple choice types of questions." Mrs. Davis stated at trial that she had related her fears to the doctors but that no one had ever explained what psychological or psychiatric testing involved.

Dr. Minard did not see Mrs. Davis following this discussion, but did relate his findings to Western Electric in a letter dated May 29, 1979, wherein he stated that the "psychogenic element to her problem is the primary consideration." He reiterated this opinion during his deposition and noted that as of May 15, 1979, Mrs. Davis had no physical problems with her wrists or hands. He also stated that he had no opinion regarding the relation of the psychogenic problem to the employment.

On at least one occasion, May 14, 1979, Dr. Grant had suggested psychiatric consultation to Mrs. Davis. In Dr. Grant's words, Mrs. Davis rejected the idea and "seemed to feel that we were questioning her sanity." Although Dr. Grant stated he informed Mrs. Davis that no one was questioning her sanity, he was unable to say for certain that he had explained what he meant by psychiatric consultation.

Earlier in this opinion we have referred to Mrs. Davis' visits with Dr. Johnson, a general practitioner. He first saw her on June 13th, rather than June 12th as testified to by Mrs. Davis. He found the appearance and range of motion of her hands and wrists to be normal and that the X-rays revealed no abnormalities. His diagnosis was that Mrs. Davis was suffering from acute tendinitis with secondary neuritis. He made no reference to any psychogenic problems at this time. However, he had examined Mrs. Davis in 1975 when she

claimed to have fainted at work, following which her hands were "numb, tingley." He diagnosed her at that time to have acute anxiety reaction. Mrs. Davis continued to see Dr. Johnson until her final visit on June 30, 1980. She generally had the same complaints and Dr. Johnson made the same findings through his final examination, i.e., that she was physically normal.

Since that time Mrs. Davis has been examined by Dr. A. D. Blenderman, an orthopedic surgeon, and Dr. Keith Barnett, a physician who has completed 3 years of residency in psychiatry but is not yet board certified. Dr. Blenderman had Mrs. Davis examined by Dr. Nitz, a neurologist who did an electromyographic test of the right wrist, which test was negative with no evidence of carpal tunnel syndrome. Dr. Blenderman made a diagnosis of possible mild synovitis of both wrists with a psychogenic overlay. He did not believe that the synovitis was of great significance, and was not able to express an opinion as to her capability for work as of June 1979, but as of the date of his examination, July 23, 1980, his objective findings revealed normal conditions in the wrist.

For reasons not apparent from the record, Mrs. Davis finally agreed to see Dr. Barnett on August 9, 1980, over a year after her termination by Western Electric. On that date he conducted a "mental status examination" which, when combined with the case history which he had received from Mrs. Davis, allowed him to make a diagnosis. He came to the conclusion that she suffered from depression and anxiety, as well as a psychogenic pain disorder. Dr. Barnett saw Mrs. Davis again on September 16, 1980, noted no improvement in her condition, and recommended further therapy. In his opinion Mrs. Davis requires therapy for a "prolonged time" before she achieves total recovery and can resume gainful employment.

In response to cross-examination, Dr. Barnett agreed that if the facts proved to be different from those related by Mrs. Davis with regard to the company

medical doctor and his relationship with her, his diagnosis might change. He also agreed that if Mrs. Davis would have undergone in April and May of 1979 the type of therapy which he, Dr. Barnett, now suggested, her condition might not have deteriorated to the degree that now existed. In other words, he admitted that it was possible that if she would have undergone psychiatric and psychological evaluation and treatment at that time, she might never have reached the state that he believed her to be in at the time of his examination.

In reviewing workmen's compensation cases this court recently noted that it "'is not free . . . to weigh the facts anew. Our standard of review accords to the findings of the compensation court the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly wrong.'" *Erving v. Tri-Con Industries, ante* p. 339, 342, 314 N.W.2d 253, 255 (1982). Furthermore, the order of the compensation court "'may be reversed or set aside with respect to the evidence only where there is not sufficient evidence in the record to warrant the order or judgment. In testing the sufficiency of the evidence to support the findings, every controverted fact must be resolved in favor of the successful party and he should have the benefit of every inference that can be drawn therefrom. . . . Such findings on rehearing will not be set aside on appeal unless clearly wrong.'" *Mack v. Dale Electronics, Inc.*, 209 Neb. 367, 371, 307 N.W.2d 814, 816 (1981).

Mrs. Davis assigned two errors in this matter; one regarding her disability, and the second regarding the cause of her psychogenic pain disorder. The record before this court contains sufficient competent evidence to support the compensation court's finding that Mrs. Davis suffered from no physical disability at the time she was terminated by her employer. The testimony of Dr. Minard indicated that, as of May 29, 1979, Mrs. Davis was physically normal. The report of Dr. Hertzler, the neurologist, indicated that he found no "objective evidence of any neurologic deficit" and that

any "deficits which are present are of nonorganic type." It was the general conclusion of both Dr. Minard and Dr. Grant that Mrs. Davis was in need of psychological or psychiatric assistance at the time she was reinstated to her position in the assembly department. Such testimony provides sufficient evidence to support the compensation court's finding on rehearing that "plaintiff suffered no physical impairment which would prevent her from performing the work offered by the defendant."

The testimony of Dr. Johnson, relating to his examination of Mrs. Davis in June 1979, does indicate that, in Dr. Johnson's opinion, Mrs. Davis was still suffering from "acute tendinitis" and secondary "neuralgia" in both hands. It must be noted, however, that "[a]s a general rule, where the record presents nothing more than conflicting medical testimony, this court will not substitute its judgment for that of the Workmen's Compensation Court." *Riha v. St. Mary's Church & School, Inc.*, 209 Neb. 539, 544-45, 308 N.W.2d 734, 738 (1981). In light of this rule, we cannot conclude that the compensation court was "clearly wrong" in finding that Mrs. Davis suffered no physical impairment preventing her from working and, therefore, must affirm that portion of the finding reached on rehearing.

The conclusion that Mrs. Davis was not physically impaired at the time she was terminated makes it apparent that any disability suffered by her at that time had to have been based upon some psychological problem. Therefore, we are confronted with Mrs. Davis' second assignment of error which concerns the propriety of the compensation court's finding that any psychological problem with which Mrs. Davis was afflicted was not compensable, as it did not arise out of her employment by Western Electric.

We have just recently restated the rule that a claimant may be allowed compensation for neurosis if it is a proximate result of her injury and results in disability. *Erving v. Tri-Con Industries, supra.* See,

also, *Lee v. Lincoln Cleaning & Dye Works*, 145 Neb. 124, 15 N.W.2d 330 (1944). Before we even reach the question of whether Mrs. Davis was disabled, the rule cited above requires an initial determination as to whether the neurosis or psychogenic disorder was the "proximate result" of the employee's injury.

"The plaintiff in a workmen's compensation case must prove by a preponderance of the evidence that his disability is the result of an accident arising out of his employment." *Riha v. St. Mary's Church & School, Inc., supra* at 542-43, 308 N.W.2d at 737. The compensation court determined, in Mrs. Davis' case, that "it is as likely, or more likely, that plaintiff's psychological problems were caused by personal family and domestic difficulties," and therefore denied compensation.

As noted earlier, Mrs. Davis was examined and found to be physically normal, exhibiting no objective symptoms of an injury. We have said: "'[U]nless the character of the injury is objective, that is, where its nature and effect are plainly apparent, then it is a subjective condition necessitating expert testimony.'" *Mack v. Dale Electronics, Inc.,* 209 Neb. 367, 370, 307 N.W.2d 814, 816 (1981). An allegation that an employee suffers from a psychogenic pain disorder raises a subjective condition and requires competent medical testimony to show a causal connection between the alleged injury, the employment, and the disability.

In an effort to meet this burden, Mrs. Davis presented the testimony of Dr. Barnett, a physician with 3 years of residency training as a psychiatrist. Due to Mrs. Davis' earlier refusal to seek psychiatric help as suggested by the employer's doctor, Dr. Barnett is the only person trained in psychiatry to have examined Mrs. Davis and the only one whose testimony is before this court. We are forced to proceed on the basis of this limited information.

The case history related by Mrs. Davis to Dr. Barnett included a recitation of the various physicians who had examined her, the various restrictions placed on her

activities by her employer, the moves from job to job, and her opinion that the medical department of Western Electric was not following the instructions of her various physicians. We might add parenthetically that this "fact" was vigorously denied by Dr. Grant and the medical records seem to support his position. Her case history apparently failed to mention the trouble with her hands in 1975 and the diagnosis by Dr. Johnson that she had an "acute anxiety reaction." She mentioned the fact of her divorce in 1978, but did not explain that in a responsive pleading filed on her behalf by her counsel at the time, it was alleged that her husband had abandoned her, which caused her "grief, anguish and illness which necessitated . . . being unable to work for approximately one hundred six days." Neither did she say that this same former husband was working at the same Western Electric plant when her employment was terminated.

On the basis of the case history, and a "mental status examination" administered by the doctor, Dr. Barnett was able to conclude that Mrs. Davis suffered from depression, anxiety, and a psychogenic pain disorder. Further, he was able to draw the opinion that these problems were related to Mrs. Davis' injury in January 1979, and had rendered her totally disabled as of June 1979. When asked about the relationship of the psychological problems to Mrs. Davis' job, the doctor responded, "In my opinion she was initially physically hurt and because of the kind of treatment she received, particularly from the medical plant and Dr. Grant, that anxiety and depression became more involved and at that point it became a psychogenic pain disorder." From his examination, Dr. Barnett was able to conclude that Mrs. Davis was totally disabled and not able to return to gainful employment.

It is Mrs. Davis' contention that in light of this opinion, and the fact that there is no testimony to contradict it, the compensation court was clearly wrong in finding that Mrs. Davis' disorder was related to factors

other than her employment. In this respect, this case is very similar to *Erving v. Tri-Con Industries, ante* p. 339, 314 N.W.2d 253 (1982), wherein we noted: "Mrs. Erving argues that where an expert testifies without contradiction or conflicting evidence, a court is required to accept the expert's testimony as true. That, of course, is not the rule in this jurisdiction. Triers of fact are not required to take the opinions of experts as binding upon them." *Id.* at 344, 314 N.W.2d at 256. Similarly, the compensation court was not bound in this instance by the uncontroverted assertion of Dr. Barnett that the psychogenic pain disorder was caused by Mrs. Davis' work-related injury and subsequent treatment thereof.

Dr. Barnett's qualifications relating to the diagnosis of psychogenic pain disorders and their relation to work were impeached. Dr. Barnett did state that diagnosing such disorders was not "unusual" for him, yet he also noted that he had not had "all that much" experience in treating persons suffering from "mental disorders or emotional problems resulting from an industrial environment." Such testimony gives one the impression that, while Dr. Barnett may be qualified to diagnose a psychogenic disorder, his qualifications in relating such a disorder to industrial causes are less than impressive and may have given the compensation court reason to discount his testimony. A related aspect of the doctor's testimony was an admission that symptoms similar to those displayed by Mrs. Davis can and do arise from nonwork-related causes, and, furthermore, that a psychogenic condition is not "limited to industrial causes." The presence of these "other causes," when combined with the doctor's less than impressive credentials in industrial-related disorders, serves to lessen the impact of his flat assertion that Mrs. Davis' condition was caused by the work-related injury she suffered in January 1979.

Finally, it should be noted that "[t]he value of an opinion of an expert is no stronger than the facts upon

which it is based." *Riha v. St. Mary's Church & School, Inc.*, 209 Neb. 539, 545, 308 N.W.2d 734, 738 (1981). In this instance Mrs. Davis was evaluated by Dr. Barnett over a year and 1 month after she was terminated and over a year and a half after the initial injury. Such a lapse of time is of special importance in light of Dr. Barnett's statement to the effect that Mrs. Davis' perception of the facts and events that transpired between January and June 1979 formed the basis of his diagnosis and opinion. In this respect, Mrs. Davis' perception of events occurring over a year earlier may have become tainted by the lapse of time and the impending litigation. While Dr. Barnett attempted to convey his feeling that Mrs. Davis' perception of the events remained unchanged over the passage of time, he admitted on cross-examination that he was unable to determine, from reading the medical records and reports, exactly what Mrs. Davis' perception may have been at the time of the injury. His final words on the matter were that he believed Mrs. Davis "felt at that time that she had a wrist injury that kept her from working."

One finds an example of how perceptions can become tainted by the passage of time and events by comparing the testimony of Dr. Johnson with that of Dr. Blenderman and Dr. Barnett. When asked why Mrs. Davis came to see him on June 13, 1979, Dr. Johnson responded by reciting the case history she had given him on that date. This version of the case history contains no mention that the medical department ignored recommendations of treatment given to Mrs. Davis by outside doctors. Counsel for Mrs. Davis made an attempt to rectify this omission on cross-examination by reading to Dr. Johnson the histories given to Dr. Blenderman and Dr. Barnett by Mrs. Davis a year later, asking whether these were the same as the one given Dr. Johnson. These latter histories did contain comments to the effect that the medical department had "ignored" recommendations made by independent doctors regarding the use of her hands. While Dr. Johnson did respond that the

history given Dr. Blenderman was the same as the one given him, he noted that Dr. Barnett had gone into more "detail." Whether Mrs. Davis did or did not mention the alleged mistreatment by the medical department to Dr. Johnson is a question of fact to be decided by the trier of fact, the Workmen's Compensation Court in this instance.

The discrepancy pointed out above, if one does indeed exist, is just an example of the conflict surrounding the allegations concerning whether the medical department ignored recommendations that Mrs. Davis receive "complete rest" for her hands. Mrs. Davis testified that Dr. Morrison ordered complete rest following the February 6, 1979, examination, while Dr. Grant indicated that Dr. Morrison had advised him that Mrs. Davis need only be restricted to duties involving "light gripping." As noted above, this type of conflict is for the trier of fact to resolve and we cannot try the facts anew. Therefore, we are unable to say that the compensation court was clearly wrong in finding that "the defendant's conduct, and particularly that of its medical department, cannot be faulted or in any way be said to have caused or contributed to whatever disability plaintiff may have suffered."

The compensation court was free to accept or reject the testimony of Dr. Barnett regarding the cause of Mrs. Davis' condition. Without the doctor's testimony, the record is devoid of any evidence supporting a finding that Mrs. Davis' psychological condition was the proximate result of her work-related injury. Due to her failure to meet this burden, we must affirm the findings and judgment of the compensation court in all respects.

Some question is raised concerning the adequacy of evidence to support the court's conclusion that Mrs. Davis' problems were related to domestic and personal difficulties. The record before this court contains a responsive pleading filed by Mrs. Davis in her dissolution proceedings, alleging that her husband caused her grief, anguish, and illness in 1975 by abandoning her,

resulting in 106 days off work. Dr. Barnett's testimony also makes reference to the fact that Mrs. Davis "hated to depend on anyone" and that since her termination she has had to depend on her children and the city of Omaha for general assistance. He also noted that she was behind in her bills, her house was up for repossession, and that she was depressed because she could not care for herself, wash or brush her hair, or dress herself.

While it is difficult to determine what domestic problems were being alluded to by the compensation court, the record does contain evidence of such difficulties. In light of this evidence, we cannot conclude that the compensation court was clearly wrong and therefore cannot set its findings aside. Furthermore, the fact remains that Mrs. Davis failed to prove by a preponderance of the evidence that the alleged psychogenic pain disorder with which she was afflicted was the proximate result of a work-related injury. This failure precludes recovery in this instance.

Western Electric also raises the defense of the refusal by Mrs. Davis to avail herself of the psychological and psychiatric services offered to her. Neb. Rev. Stat. § 48-120 (Reissue 1978) provides: "If the injured employee unreasonably refuses . . . to avail himself of medical . . . treatment . . . the employer shall not be liable for an aggravation of such injury due to such refusal . . . and the court . . . may suspend . . . or limit the compensation . . . payable . . . ." In 1 Larson, Workmen's Compensation Law § 13.22 at 3-406 (1978), it is suggested: "If psychiatric treatment is prescribed, refusal may be deemed unreasonable in view of the absence of any physical suffering in the treatment . . . ." An award was reversed and remanded, with directions to suspend payments, under a statute similar to ours in *Commonwealth, Department of Highways v. Lindon,* 380 S.W.2d 247 (Ky. 1964). However, because of the conclusion which we earlier reached, it is not necessary to decide this issue.

The findings of the Workmen's Compensation Court

were correct, and its judgment is affirmed.

AFFIRMED.

CLINTON, J., concurs in the result.